**JEVERN PHILLIP, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2012-0086

Supreme Court of the Virgin Islands

June 26, 2013

570

KELE ONYEJEKWE, ESQ., Appellate Public Defender, St. Thomas, USVI, *Attorney for Appellant.*

JENNIFER L. AUGSPURGER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and MOORE, *Designated Justice.*[1]

## OPINION OF THE COURT

### (June 26, 2013)

HODGE, *Chief Justice.* Jevern Phillip appeals from an August 16, 2012 Judgment and Commitment issued by the Superior Court of the Virgin Islands.[2] Phillip was adjudged guilty of a number of offenses, including first-degree murder, and was sentenced, *inter alia*, to life imprisonment without the possibility of parole.[3] The Court rejects Phillip's challenges to the sufficiency of the evidence and to alleged trial errors, and affirms Phillip's convictions.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

This case involves the fatal shooting of Kevin James on March 6, 2010. James and his companions — Niki Steele, Kamba Jackson, and Hasheem Smith — spent the evening of March 5, 2010 together, visiting various entertainment venues on St. Thomas. (J.A. 271-72.) The four friends travelled to their destinations in a burgundy Jeep Wrangler, which belonged to Jackson's sister, and which Jackson drove. (J.A. 267, 623.) Eventually, the four individuals arrived at Jaguars nightclub ("Club") in

---

[1] Associate Justice Ive Arlington Swan is recused from this matter. The Honorable Thomas K. Moore has been designated to sit in his place pursuant to title 4, section 24(a) of the Virgin Islands Code.

[2] The Judgment was entered on the docket and issued to the parties by the Clerk on August 16, 2012, but was signed on August 14, 2012. For this Court's purposes, the relevant date is the date of entry of the order or judgment on the docket — which constitutes the date on which it was issued — and not the date on which it was signed. *See* V.I.S.CT.R. 5(b)(1) and 5(b)(6).

[3] In an Amended Information filed on May 17, 2012, the People charged Phillip with murder in the first degree (Count 1); murder in the second degree (Count 3), assault in the first degree (Count 5); reckless endangerment in the first degree (Count 7); and associated firearm charges (Counts 2, 4, 6). (J.A. 1689-95.) He was convicted of Counts 1, 5, and 7, and the associated firearm charges of Counts 2 and 6. (J.A. 1508-10.) He was found not guilty of second-degree murder and the associated firearms charge; the court vacated the not guilty verdicts because it found them to be inconsistent with its instructions. (J.A. 1509.)

the Long Bay area of St. Thomas. (J.A. 272.) James and Smith went into the Club, while Steele and Jackson "cool[ed] out" in the Wrangler in the Tramway parking lot across the street from the Club. (J.A. 272.)

Steele testified that at some point that morning,[4] the lights came on in the Club and James and Smith exited, returning to the Wrangler. (J.A. 275.) Jackson remained in the driver's seat of the Wrangler, Steele sat in the front passenger seat, Smith sat behind Jackson on the driver's side, and James sat behind Steele. (J.A. 276-77.) They left the Tramway parking lot, went to a gas station store to purchase pizza, and then travelled towards the basketball court in the Hospital Ground neighborhood, where James lived. (J.A. 276-77.)

Once at Hospital Ground, they stopped the Wrangler in a well-lit area near the basketball court so that Jackson could relieve himself. (J.A. 278, 282.) While awaiting Jackson's return, Steele heard a vehicle, which she later described as a "Grand Vitara" sport utility vehicle ("SUV"), approaching from the rear and it began to accelerate. (J.A. 279.) As the vehicle approached the Wrangler, it slowed down. (J.A. 280.) Once the vehicle was alongside the Wrangler, Steele saw firearms pointing out of the front and back windows on the driver's side of the vehicle. (J.A. 280.) She yelled for everyone to "duck," and then heard ten to twelve shots fired at the Wrangler from the other vehicle.[5] (J.A. 281.) James and Steele were hit by the shots; Steele received minor injuries but James suffered a fatal wound to his head and later died at the hospital. (J.A. 298.)

Although Steele was not able to identify the occupants of the Vitara (J.A. 303), Officer Alex Dorsett did. Dorsett, an off-duty Virgin Islands police officer, was working part-time as a security guard for the Club on March 6, 2010. (J.A. 306.) He saw Jamal Morton[6] arrive at the Club in a champagne-colored SUV, the license plate of which read T-D-L 1-8-9. (J.A. 308-09.) Two other individuals were with Morton in the SUV. (J.A. 311.) Dorsett made an in-court identification of Phillip and Maliek

---

[4] Initially Steele testified that James and Smith exited the club when it closed "after 2:00 [a.m.] probably minutes to 3:00 [a.m.]." (J.A. 274.) She subsequently testified that "Jaguars was finished after four o'clock." (J.A. 277.)

[5] Steele stated that the Vitara was "a light gray, like a lightish kind of color type." (J.A. 282.)

[6] Morton's case was severed from Ostalaza and Phillip's case.

Ostalaza[7] as Morton's two companions. (J.A. 311.) Dorsett knew Phillip because Phillip was a regular at the Club, and had a distinct habit of getting a cup of ice at the bar, but leaving the bar to go to his vehicle and fill his cup with liquor before returning to the Club. (J.A. 314-15.) Dorsett remembered Ostalaza from the night of March 6, 2010, but did not previously know him. (J.A. 315.)

Dorsett saw the three men leave the Club around 3:45 a.m., not long before the Club closed. (J.A. 317.) They returned to the SUV, with Phillip in the driver's seat, Morton in the front passenger seat, and with Ostalaza seated behind Phillip. (J.A. 316-18.) Dorsett observed the SUV leave the Club parking lot and drive to the Tramway parking lot across the street, where it remained for a short time. (J.A. 317-18.) After the Club closed, Dorsett saw "three individuals from 'round the field area' " leave the Club and cross the street to get into a maroon Jeep Wrangler that was also parked in the Tramway parking lot. (J.A. 320.) Dorsett described the three men as "[t]wo black rasta males and one was a clean-cut individual, black male also." (J.A. 320.) The Wrangler left the Tramway parking lot with "[o]ne of the tall rasta guys" driving, and it headed northward. (J.A. 321.) The champagne-colored SUV then . . . took off directly after it," "[a]bout approximately a minute or two minutes" later.[8] (J.A. 322.) Not long after their departure, Dorsett was talking to a police officer who was stopped on the road near the Club, and he heard over the police radio transmission, "shots fired in the 'round the field area.' " (J.A. 323.)

After hearing this, Dorsett left the Club and went to the police station to give a statement. (J.A. 324.) In a statement transcribed on March 6, 2010, Dorsett identified as one of the suspects Jamal Morton, whom he described as "5'10", slim buil[d]," and wearing a "[b]aseball cap, white polo shirt with stripes, and jean pants." (J.A. 357-58.) He gave a more limited description of the other two individuals, stating that "[o]ne was a dark[-]skinned male, and one was a brown[-]skin[ned] male." (J.A. 359.) He stated that he could recognize the "brown-skin[ned] male" if he saw

---

[7] Ostalaza, Phillip's co-defendant, has filed a separate appeal, docketed as S. Ct. Crim. No. 2012-0071.

[8] When confronted with his testimony from the detention hearing, where he had testified that the champagne-colored SUV left "two to three minutes" later, Dorsett testified that "[i]t took off exactly after the Jeep Wrangler took off. I wasn't looking at my watch but it was approximately 'bout two to three minutes . . . . One minute, two minutes, three minutes." (J.A. 342.)

him again, because he was a regular at the Club on the weekends and a "heavy drinker."[9] (J.A. 359, 367.) At the time of his statement, Dorsett did not indicate that he could name the "dark[-]skinned male," nor was he able to describe the man other than stating that he was about 5'10"". (J.A. 360-61, 367.) Dorsett also told the police that he could not identify any of the individuals by name. (J.A. 360, 365.) About two weeks after the incident, Dorsett returned to the police department. He identified Phillip as the driver of the SUV by selecting his photograph from a photo album[10] (J.A. 305), and, using a photo array, identified Ostalaza as the passenger in the SUV who was seated behind the driver. (J.A. 329-33.) At trial, Dorsett identified both Phillip and Ostalaza as having been in the SUV. (J.A. 311.) He also testified that Ostalaza had been at the same Club with Morton the weekend before the incident, although that information was not included in his statement. (J.A. 345.)

Officer David Petersen also worked as a security guard at the Club on March 6, 2010. At some time after 3:00 a.m., he saw a "champagne, goldish color Vitara" park in the driveway underneath the Club's balcony. (J.A. 925-26.) He then saw Morton, Ostalaza, and another man he could not identify, inside the Club. (J.A. 927-29.) The unidentified man had "light skin," and was wearing a red shirt. (J.A. 930.) Later, Petersen saw Ostalaza and Morton leave together, and go out to the Vitara. (J.A. 929-30.) The unidentified man sat in the driver's seat of the Vitara, Morton sat in the front passenger seat, and Ostalaza sat in the rear. (J.A. 931.) He saw the Vitara leave the Club parking lot and park in the Tramway parking lot across the street. (J.A. 931.) After the Club closed, Petersen saw three people he knew from the Hospital Ground area leave the Club: a "rasta" male, a female, and another male, and they walked towards the maroon Wrangler Jeep, which was also parked in the Tramway parking lot. (J.A. 934.) The "rasta" man drove the Wrangler, the female sat in the front seat and the other male sat in the back. (J.A. 934.) The Wrangler turned west and "like seconds after," the champagne-

---

[9] Dorsett acknowledged the following exchange: The police officer taking his statement asked Dorsett, "If you were to see either of those two again can you recognize them," to which Dorsett responded, "Yes, I can[. T]he brown[-]skinned [man,] he is a regular of the club on weekends." (J.A. 370.)

[10] During cross-examination, Dorsett admitted that although he testified during the trial that he had selected Phillip's photograph from an album, he had previously testified during the detention hearing that the photograph was selected from a photo array. (J.A. 336.)

colored Vitara followed. (J.A. 935.) Minutes later, Petersen heard a transmission over the police radio "[s]hots fired 'round the field.' " (J.A. 946.) Petersen then headed to the camera room at the police station because he knew there was a security camera recording footage in the area where the shots were reportedly fired. (J.A. 936.) While Petersen was at the police station, the police transcribed a statement from him. (J.A. 958.) Although Petersen identified Ostalaza during his trial testimony, in the March 6, 2010 written statement he did not identify Ostalaza, and did not describe him other than to state that he was a male. (J.A. 966.) When asked by the police if he could identify the person seated in the back seat of the Vitara, Petersen indicated that he could not. (J.A. 970.)

Ebonee Brooks, a co-owner of the Club, also testified for the People. She indicated that she was working at the front door of the Club from the evening hours of March 5 into the morning hours of March 6. (J.A. 432.) Brooks saw a champagne-colored SUV[11] pull into the parking lot and park where it is "not normal for anyone to park," which caught Brooks's attention. (J.A. 433.) She saw three men get out of the SUV and enter the Club. (J.A. 433.) She testified that one man was a "[t]all, dark male" with a black hat. (J.A. 434.) The second individual was a "tall, light[-]skin[ned]," man that Brooks believed had braids. (J.A. 434.) The last individual she could only describe as being a dark-skinned man who was shorter than the other two men. (J.A. 435.) Once they left the Club parking lot, they drove the SUV across the street to the Tramway parking lot. (J.A. 435.) Having seen this occur, Brooks called 9-1-1 and provided the dispatcher with a description of the vehicle and its license plate number. (J.A. 436.) The champagne-colored SUV left that parking lot "directly behind" a Jeep Wrangler. (J.A. 436-37, 446.) Several days after the incident, Brooks identified two of the three men — subsequently established to be Phillip and Morton — by looking through photographs at the police station. (J.A. 437.) In a written statement taken by the police, Brooks stated that she could not identify the color of the SUV. (J.A. 442.)

Deputy Chief Maria Colon Jones was the supervisor of the Virgin Islands Police Department's camera room for the St. Thomas/St. John district at the time of the incident. (J.A. 469.) After hearing about the shooting, Jones went to the camera room at about 6:00 a.m. or 7:00 a.m.

---

[11] Brooks's co-owner, Reynold Charles, also identified the vehicle as a "goldish, champagne[-colored] SUV." (J.A. 456.)

and reviewed footage from police department cameras placed around St. Thomas. (J.A. 471, 482.) Petersen, who had arrived at the camera room not long after the shooting and had already been reviewing the footage, pulled up a feed showing a vehicle traveling in the area of the Lionel Roberts Stadium and Maude Proudfoot Drive ("Computer Monitor Video").[12] (J.A. 452.) Jones was unable to extract the video from the hard drive, so she obtained a camcorder and had Sergeant Marsh record a video of the computer monitor as it displayed the feed from the cameras in the area of Hospital Ground ("Camcorder Video"). (J.A. 471, 475.)

From the Computer Monitor Video feed, Jones identified a "goldish, champage[-]color" four-door Grand Vitara heading in an easterly direction from Maude Proudfoot Drive and the Jarvis school towards the fish market by the Stadium. (J.A. 472.) Petersen identified the vehicle as the Vitara he saw at the Club, noting that he could see Morton and the driver, and that they were wearing the same shirts he saw them in at the Club. (J.A. 939.) Petersen looked at a second camera feed and saw the Vitara heading towards the basketball courts "at an abnormal speed." (J.A. 939-40.) After two or three minutes, the Vitara came back in a westerly direction past the Stadium and up Maude Proudfoot Drive towards Mafolie hill, traveling on the wrong side of the road. (J.A. 473, 940.)

Jones indicated that the Computer Monitor Video could be zoomed in or slowed down as she manipulated the main screen. (J.A. 475.) Jones and Petersen both explained that the Computer Monitor Video was "much clearer" than the Camcorder Video, and that they could not preserve a recording of the Computer Monitor Video because the computer system was too old. (J.A. 471, 475, 951, 941.) Because the security camera system at the police department rewrites and rerecords every thirty days, the original of the Computer Monitor Video has been lost. (J.A. 484.)

The People also called Aisha Abbott to testify as a witness. Abbott, Phillip's step-sister, worked at Dependable Car Rental at the time of the incident. On March 2, 2010, she fraudulently used her sister's name and a customer's credit card to rent a beige-colored Suzuki Vitara with the

---

[12] To avoid confusion, the Opinion will employ the defined terms, "Computer Monitor Video" and "Camcorder Video." The first term relates to the security camera feed as it was displayed on the computer monitors in the computer room. The second term relates to the video created by the camcorder as it was pointed at the computer monitors.

license plate T-D-L 1-8-9, because she wanted to run some errands. (J.A. 376, 381-82.) She testified that on March 5, 2010, she used the rented Vitara to go to the apartment of Officer Joycelyn Lee-Bobb, her step-mother, to visit her step-sister, Chanice Smith, and Smith's newborn baby. (J.A. 382-84.) Lee-Bobb is Smith and Phillip's mother, and they both lived with her. When Abbott arrived at Lee-Bobb's apartment, Phillip was there. (J.A. 384.) Abbott testified that she fell asleep at the apartment[13] and when she woke up, the Vitara and the keys were missing, and she did not see Phillip in the apartment. (J.A. 387-88.) Abbott went back to sleep and when she awoke around 6:00 or 7:00 a.m., Phillip was back in the apartment. (J.A. 390.) According to Abbott, Phillip informed her that someone had broken the window of the driver's side passenger door of the Vitara. (J.A. 391.) Abbott then asked Phillip if he had taken the Vitara and he admitted that he had taken it to go to town "quick." (J.A. 396.) When she went outside, Abbott saw that the vehicle's driver-side rear window was broken and that the driver-side door was dented. (J.A. 397.) The police obtained a statement from Abbott and seized the vehicle. They found that the window had been shot out, and that there were fragments of bullets inside the Vitara.

The People concluded their case, and after the defendants made their motions for acquittal (J.A. 984-1045) — which were denied (J.A. 1045) — the defense called Chanice Smith, Phillip's sister. (J.A. 1048.) She testified that in the evening of March 5 into the morning of March 6, 2010, she was at Lee-Bobb's apartment, where she lived. (J.A. 1049.) When she went to sleep at about 11:00 p.m., Phillip was in the apartment, but — contradicting Abbott's testimony — Smith indicated that Abbott was not in the apartment that evening. (J.A. 1054, 1059.) Smith testified that her newborn son woke her up at about 3:22 a.m. or 3:23 a.m. (J.A. 1048.) She got out of bed and went to the kitchen to make a bottle for him. (J.A. 1048-49.) As she did so, she passed Phillip's room, where she saw him sleeping in his bed with his girlfriend, Shamika Ostalaza ("Shamika").[14] (J.A. 1049, 1052.) She could see into the room because a towel on the door had prevented it from closing. (J.A. 1051.) After feeding her baby, Smith and her boyfriend went outside to smoke a

---

[13] In her written statement, Abbott indicated that she went to sleep around 9:00 p.m., but at trial she testified that she went to sleep around 11:00 p.m. (J.A. 312.)

[14] Smith testified that Shamika is co-defendant Maliek Ostalaza's sister. (J.A. 1066.)

marijuana cigarette "until about 5:00 going on six o'clock that morning." (J.A. 1049.) Seiba Joseph, Smith's boyfriend, corroborated Smith's testimony. (J.A. 1069-95.) On cross-examination, Smith admitted that even after she found out Phillip was a suspect, she did not go to the police to inform them that Phillip had been at Lee-Bobb's apartment all evening. (J.A. 1061.) She indicated that she did not do so because she preferred to speak to her brother's lawyer. (J.A. 1061-62.)

Shamika testified that she arrived at Lee-Bobb's apartment at about 11:00 p.m. on March 5, 2010, after finishing work. (J.A. 1099.) She said goodnight to Smith and Joseph and went to Phillip's room. (*Id.*) After having sex with Phillip, she went to sleep "around 1:00 something [a.m.]." (*Id.*) She testified that Phillip never left the apartment, and that Abbott was never there. (J.A. 1102.) She admitted that she never went to the police to tell them that Phillip had been with her all night, nor did she inform Lee-Bobb of this fact. (J.A. 1105-06.)

Lee-Bobb also testified. After she finished work at about 11:00 p.m. on March 5, 2010, she went to her apartment, arriving shortly before 11:30 p.m. (J.A. 1113.) When she arrived home, her son Phillip was on the porch smoking. (J.A. 1113.) She passed her daughter Chanice's bedroom, and saw Chanice, Joseph, and their baby sleeping in Chanice's bed. (J.A. 1113, 1140.) She went to her bedroom to secure her service firearm and then came back out to the living room to watch television. (J.A. 1114, 1151.) She watched television until "about 1:30 going on two o'clock," when she went to sleep. (J.A. 1114.) At that time, she testified, Phillip was still home. (J.A. 1114.) Lee-Bobb woke up at about "5:00 or a li'l after 5:00" to feed Smith's baby, who had woken up crying.[15] (J.A. 1115.) At that time, she saw Phillip in his room, embracing someone on the bed. (J.A. 1116.) She could see into his room because the door was "wide open." (J.A. 1155.) At no point in the evening of March 5 or the morning of March 6 did she see her step-daughter, Abbott, at the apartment. (J.A. 1118.) When Lee-Bobb found out Phillip was a suspect, she did not initially tell anyone that he was at home with her that night. (J.A. 1159.) She did tell the police this once they asked her for a statement on March 12, 2010. (J.A. 1159, 1166.)

---

[15] She stated that she did not hear the baby crying around 2:00 a.m. or 3:00 a.m., the time at which Smith had stated that the baby had woken up crying for his bottle. (J.A. 1050.)

581

After the five-day trial, the jury convicted Phillip of murder in the first degree, assault in the first degree, reckless endangerment, and associated firearm charges.[16] Phillip filed a Motion for Judgment of Acquittal, or for a New Trial, which the court denied. (J.A. 1507-1522.) Phillip filed this timely appeal on August 10, 2012.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Because the Superior Court's August 16, 2012 Judgment and Commitment is a final judgment, this Court has jurisdiction to consider Phillip's appeal. *See, e.g., Browne v. People*, 56 V.I. 207, 216 (V.I. 2012) (stating that in a criminal case, a written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for purposes of 4 V.I.C. § 32(a)); *Melendez v. People*, 56 V.I. 244, 251 (V.I. 2012) (same).

The Court reviews the Superior Court's factual findings for clear error and exercises plenary review over the Superior Court's application of the law to those facts. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007); *see also People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)), *aff'd*, 654 F.3d 412, 55 V.I. 1324 (3d Cir. 2011). Where an appellant fails to object to a Superior Court order or decision, the Court reviews for plain error. V.I.S. CT. R. 4(h); *Phipps v. People*, 54 V.I. 543, 546 (V.I. 2011).

When reviewing a challenge to the sufficiency of the evidence leading to a conviction, the standard "is whether there is substantial evidence, when viewed in the light most favorable to the government, to support the jury's verdict." *Marcelle v. People*, 55 V.I. 536, 541 (V.I. 2011); *Ritter v. People*, 51 V.I. 354, 358, 361 (V.I. 2009). "The appellate court 'must affirm the convictions if a rational trier of fact could have found the defendants guilty beyond a reasonable doubt and the convictions are

---

[16] The jury also found Phillip not guilty of second-degree murder and the associated firearm charge, but the court vacated these verdicts as being inconsistent with the trial court's instructions.

supported by substantial evidence.' " *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009) (quoting *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990)). "This evidence 'does not need to be inconsistent with every conclusion save that of guilt' in order to sustain the verdict." *Id.* at 145 (quoting *United States v. Allard*, 240 F.2d 840, 841 (3d Cir. 1957) (citing *Holland v. United States*, 348 U.S. 121, 75 S. Ct. 127, 99 L. Ed. 150, 1954-2 C.B. 215 (1954))). "An appellant who seeks to overturn a conviction on insufficiency of the evidence grounds bears 'a very heavy burden.' " *Id.* at 145 (quoting *United States v. Losada*, 674 F.2d 167, 173 (2d Cir. 1982)).

## B. Sufficiency of the Evidence[17]

### 1. *Sufficiency of the Evidence as to Identity*

■ Phillip argues that the People presented insufficient evidence for a reasonable jury to have found him guilty beyond a reasonable doubt. He contends that, "at best," only two witnesses testified that he was in the Vitara and that Abbott's testimony indicating that Phillip took the Vitara that night is contradicted by the testimony of Lee-Bobb and the other occupants of her apartment. (Appellant's Br. 14.)

■ As noted above, a defendant in a criminal case challenging the sufficiency of the evidence against him "bears 'a very heavy burden.' " *Latalladi*, 51 V.I. at 145 (quoting *Losada*, 674 F.2d at 173). This is so because on appellate review, the Court considers the evidence in a light favorable to the government, and generally does not second-guess the credibility determinations of the jury. While those determinations are given great deference, however, they are not conclusive, *People v. Williams*, 383 Ill. App. 3d 596, 891 N.E.2d 904, 940, 322 Ill. Dec. 613

---

[17] The People argue that Phillip has waived his sufficiency arguments because his Motion for Judgment of Acquittal was untimely. The trial concluded on May 18, 2012. Rule 29 of the Federal Rules of Criminal Procedure requires that the defendant file the motion for judgment of acquittal within fourteen days after the guilty verdict. Phillip did not file his motion until June 4, 2012. Putting aside the fact that the People's own opposition to Phillip's motion was itself late — having been filed on June 21, 2012, instead of June 18, 2012 (LRCi 7.1(e)(1)) — the People have not complied with this Court's rules requiring them to indicate where in the record they raised that objection below. V.I.S. Ct. R. 22(a)(3), (b). Because they did not, we consider the People's waiver argument to itself be waived; thus, we need not reach the question of whether an untimely Rule 29 motion at the trial court waives an appellant's sufficiency challenges.

(2008), and an appellate court may disregard the jury's reliance on a witness's testimony when that testimony is "inherently incredible or improbable." *Williams v. Gov't of the V.I.*, 51 V.I. 1053, 1086 (D.V.I. App. Div. 2009) ("Testimony is deemed inherently incredible or improbable where it is 'either so manifestly false that reasonable [people] ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable [people] should not differ.' " (quoting former version of 29A AM. JUR. *Evidence* § 1375 (2008))).

We conclude that there was sufficient evidence for a reasonable jury to find Phillip guilty of the crimes charged. While Phillip is correct that there is no direct evidence identifying him at the scene of the shooting, there was other evidence from which the jury could infer that Phillip participated in the killing. Two off-duty police officers identified Phillip at the scene of the nightclub, just prior to the shooting incident; one recognized Phillip as a regular and remembered his habit of leaving the Club to obtain liquor from his car, rather than paying at the bar. (J.A. 295-96.) They noted that Phillip left the Club and entered a Vitara with the T-D-L 1-8-9 license plate. Not long after James and his friends left in their Wrangler, the Vitara that Phillip was driving followed quickly behind. A vehicle resembling the Vitara was soon seen on security camera footage in the Hospital Ground area, and Petersen identified Phillip on the camera footage as the driver of the Vitara by his clothing — a red and white shirt — that he had been seen wearing at the Club. (J.A. 953.) Moments later, the shooting erupted near the basketball court. Steele testified that an SUV of a color similar to the Vitara was the one from which the shots were fired. Furthermore, Abbott testified that she fraudulently rented the Vitara from her place of employment and parked it at the apartment of Phillip's mother on March 5, 2010. She further testified that she did not see Phillip when she woke up, and after she went back to sleep and awoke again later that morning, Phillip had returned. At that time, he reluctantly admitted having taken the vehicle and indicated that the vehicle was damaged, and Abbott noticed that the driver's-side back window was shot out and the driver's-side rear door was dented. This evidence is substantial, and would permit a jury to find that Phillip participated in the murder; taken together, this is certainly more than the "mere speculation" that would invalidate a conviction. (Appellant's Br. 14 (citing *Mendoza v. People*, 55 V.I. 660, 667 (V.I. 2011) (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996))).)

It is true that there was evidence to support Phillip's alibi defense. Smith, Joseph, Lee-Bobb and Shamika all testified that Phillip remained home that evening and that Abbott was never there. However, because their testimonies were not entirely consistent, the jury could have discredited them.[18] (J.A. 1115.) Furthermore, the jury might have believed Abbott rather than Phillip's closer family members because, when she provided her statement to the police, she was confessing to having committed a crime. Moreover, they may have considered the fact that the same vehicle rented by Phillip's sister, Abbott, was seen at the Club, with Phillip driving it, not long before the vehicle was used in the murder. Considering this evidence in the light most favorable to the government, we conclude that there was sufficient evidence from which a reasonable jury could find that Phillip was a participant in James's murder.

### 2. Sufficiency of the Evidence on Intent

■ Phillip challenges the sufficiency of the evidence supporting his conviction for first-degree murder on the theory that he aided and abetted another. In particular, he claims that the People presented no evidence pertaining to his intent to commit murder.[19] (Appellant's Br. 16.) It is true that the People presented no direct evidence of Phillip's intent to commit murder. This is not fatal to their case, however, for it is often true that there is no direct evidence of a person's intent. *See Rose v. Clark*, 478 U.S. 570, 581, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) (observing that in "many cases . . . there is no direct evidence of intent"). Instead, the

---

[18] For example, Smith testified that she awoke to her son crying for a bottle around 3:20 a.m., while Lee-Bobb indicated that she did not hear a baby cry until 5:00 a.m. (J.A. 1048, 1114, 1115). Smith testified that after feeding her child around 3:20 a.m., she went outside to smoke marijuana "until about 5:00 going on six o'clock that morning," (J.A. 1049), but indicated that she had a baby monitor with her so she could hear if her son woke up. But Lee-Bobb testified that the baby started crying around 5:00 a.m. and she had to wake to feed the baby. (J.A. 1115.)

[19] Phillip presents this argument in just two sentences of his brief. Consequently, the Court could consider it waived. V.I.S.CT.R. 22(m) ("Issues that . . . (3) are only adverted to in a perfunctory manner or unsupported by argument and citation to legal authority [] are deemed waived for purposes of appeal, except that the Supreme Court, at its option, may notice an error not presented that affects substantial rights.") However, we chose to exercise our discretion to review the matter, particularly because Phillip raised it, even if summarily, and he faces the most severe of all punishments in the Virgin Islands: a sentence of life imprisonment without the possibility of parole.

conclusion that someone acted with a particular intent is typically established through circumstantial evidence. *Ibrahim v. Gov't of the V.I.*, 47 V.I. 589, 598 (D.V.I. App. Div. 2005). The jury is entitled to draw certain inferences from the evidence presented before them. *See Nicholas v. People*, 56 V.I. 718, 735 (V.I. 2012) (stating that the jury could infer actual malice from the defendant's shooting of the victim in the back of her head).

⬛⬛ In this case, two witnesses testified that Phillip was driving the Vitara just minutes before the shooting. (J.A. 306-08; 931.) Steele, who witnessed the shooting, testified that shots were fired from the driver's seat of the Vitara. (J.A. 281.) Bullet fragments in the Vitara indicate that a weapon was fired from the driver's seat area. (J.A. 396-97, 501.) It is possible that Phillip was never in the Vitara; or that he got out of the Vitara between the Club and the scene of the shooting; or that another person in the Vitara reached across the vehicle and, without Phillip's assent, shot past him at the Wrangler. However, the evidence need not " 'be inconsistent with every conclusion save that of guilt' in order to sustain the verdict." *Latalladi*, 51 V.I. at 145 (quoting *Allard*, 240 F.2d at 841). Here, the jury was entitled to infer that Phillip was in the vehicle, remained in the driver's seat, drove it to the basketball court, and fired a weapon through the window towards the Wrangler. In the circumstances of this case, firing a weapon through a window at another vehicle is an intentional act that the jury could conclude was done to bring about the death of the occupant or occupants of that vehicle.[20] *See Brown v. People*, 54 V.I. 496, 506 (V.I. 2011) (stating that "the nature of the weapon used," "lack of provocation" and "the use of a deadly weapon on an unarmed victim" are all factors that weigh towards a finding of premeditation).

⬛ Furthermore, there is sufficient evidence that Phillip not only acted with the requisite intent, but also acted with premeditation.[21]

---

[20] It should be noted that the Legislature has provided that "the fact that [a person] was armed with a firearm, used or attempted to be used, and had no license to carry the same . . . shall be evidence of his intention to commit said crime of violence." 14 V.I.C. § 2253(c). However, the People did not request an instruction on this principle of law; instead, the jury found that that the People proved intent beyond a reasonable doubt based on the circumstantial evidence presented.

[21] Phillip argues that the evidence suggests that he acted out of "road rage," because Steele told the occupants of the Vitara as they pulled alongside the Wrangler, "Hey, ah you man. Look, check ah you self," before the shooting began. (Appellant's Br. 17.) However, the

Weighing the evidence in the light most favorable to the People, the testimony showed that the Vitara — which Phillip was driving — followed the Wrangler from the Club to the basketball court, sped up to come alongside the Wrangler, and then slowed down to facilitate the shooting. Furthermore, the use of a deadly weapon against unarmed persons in the absence of any provocation is a fact that can weigh towards a finding of premeditation. *See Nicholas*, 56 V.I. at 737 ("[T]he use of a firearm alone is not sufficient to permit an inference of premeditation . . . [H]owever, coming to the scene of a murder with a loaded weapon may constitute evidence that the accused in fact considered the plan to kill prior to committing the act itself.") (internal citations omitted). Consequently, we conclude that there is sufficient evidence of premeditation.[22] *See Brown*, 54 V.I. at 506 (stating that the nature of the

---

People must prove the absence of a sudden quarrel or heat of passion only when the defendant has first raised evidence of such a defense. *See United States v. Quintero*, 21 F.3d 885, 890 (9th Cir. 1994) (noting that the burden is on the government only once such evidence is raised); *see also Mullaney v. Wilbur*, 421 U.S. 684, 703, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) (concluding that the burden is on the government to disprove the defense "*when the issue is properly presented in a homicide case*" (emphasis added)). Here, Phillip never presented any evidence or made any argument that the killing was done as the result of "road rage" or any other sudden passion. He never requested any instruction on these grounds and the jury, therefore, never had the opportunity to weigh his heat-of-passion claim. Furthermore, it is unlikely that, even if properly presented, the jury would have credited such a defense. There were three different types of bullets used in the crime; individuals out for an otherwise peaceful drive would probably not be armed with three different weapons, and would not be prepared to use them all in quick succession, in response to an off-hand remark from another driver. In addition, the eyewitness testimony establishes that the Vitara followed the Wrangler out of the Club, indicating a premeditated intent to kill one of the Wrangler's occupants. Consequently, we reject Phillip's belatedly proposed "road rage" argument.

He further contends that the lack of evidence of motive proves that there was no premeditation. However, it is not necessary to prove motive to sustain a conviction for murder. *Pointer v. United States*, 151 U.S. 396, 414-15, 14 S. Ct. 410, 38 L. Ed. 208 (1894) ("While, as stated, a motive exists for every act done by a person of sound mind, it is not indispensable to conviction that the particular motive for taking the life of a human being shall be established by proof to the satisfaction of the jury."); *People v. Hobbs*, 35 Ill. 2d 263, 220 N.E.2d 469, 472 (Ill. 1966).

[22] Phillip also argues that there was insufficient evidence because killing a person with a firearm is insufficiently like killing them with poison, or after lying in wait, to satisfy the "other . . . willful, deliberate and premeditated killing" provision of the first-degree murder statute, 14 V.I.C. § 922(a)(1). The Court definitively rejected this same argument in *Codrington v. People*, 57 V.I. 176, 185-86 (V.I. 2012), and *Billu v. People*, 57 V.I. 455, 469-72 (V.I. 2012). Phillip acknowledges this, but presents the argument anyway because at the time

587

weapon used, lack of provocation and the use of a deadly weapon on an unarmed victim are all factors that weigh towards a finding of premeditation).

## C. Statutory Interpretation

### 1. Section 2253 of Title 14 of the Virgin Islands Code-Firearms Licensing

 Phillip argues that the trial court improperly instructed the jury as to the firearms offenses charged under section 2253 of Title 14 of the Virgin Islands Code. The court's instruction indicated that the People had to prove that Phillip "was not licensed or authorized by law to possess a firearm at the time of the alleged offense." (J.A. 1391.) Phillip argues that "the law requires *proof that the firearm was not licensed*, not that Phillip had no license." (Appellant's Am. Br. 25.) The Court reviews this challenge for plain error because it was not raised below; Phillip has the burden of establishing each "plain error" factor. V.I.S.CT.R. 4(h).

> For this Court to reverse the Superior Court under the plain error standard of review, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights." However, even "[i]f all three conditions are met," this Court will exercise its discretion to reverse the Superior Court "only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."

---

of his brief, neither Codrington nor Billu's appeal to the Third Circuit Court of Appeals had concluded. However, the law of this Court, at this time, is the law as stated in *Codrington* and *Billu*, regardless of whether the appeals proceed. *See Miller v. French*, 530 U.S. 327, 344, 120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000) (noting that courts must decide the cases before them according to the law as it exists at the time of the case); *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 975 (V.I. 2011) (holding that decisions of this Court constitute the "law" of the Territory). There is no reason for the Court to reach a different result here, even if we do not consider the argument to be waived because of its brevity and lack of citation to supporting authorities. (Appellant's Am. Br. 17.) *See* V.I.S.CT.R. 22(m). Furthermore, the Third Circuit has since denied Codrington and Billu's Petitions for Certiorari, ruling that "the Virgin Islands Supreme Court thoroughly explained its conclusion that 14 V.I.C. § 922(a)(1) does not limit first-degree murder to those committed by means of poison, lying in wait, torture, detonation of a bomb, or similar means, and instead encompasses those committed with a firearm so long as they are also 'willful, deliberate and premeditated.' Petitioner has not shown any compelling reason to review whether the Virgin Islands Supreme Court's interpretation was manifestly erroneous." *Gov't of the V.I. v. Codrington*, Case No. 12-4090 (3d Cir. April 18, 2013); *Gov't of the V.I. v. Billu*, Case No. 12-4242 (3d Cir. April 18, 2013).

*Phipps*, 54 V.I. at 546 (quoting *Francis v. People*, 52 V.I. 381, 390-91 (V.I. 2009)).

 Section 2253 specifically proscribes the possession of firearms by any person "unless authorized by law." 14 V.I.C. § 2253(a). This language clearly creates two categories of persons — those who are authorized to possess firearms, and those who are not.[23] However, Phillip cites to a number of cases to suggest that the proper interpretation of this provision is that the firearm must be "licensed" or "registered," not that the possessor be licensed. None of those cases establish that Phillip's interpretation is correct.[24]

 The Virgin Islands statutes pertaining to firearms licensing establish that it is the *person*, rather than the firearm, that is subject to licensing. Section 454 of Title 23 of the Virgin Islands Code is entitled "Persons who may be licensed to carry firearms," and it sets forth various categories of *people* who may be licensed to own firearms — it does not establish categories of firearms that may be licensed. Applicants for such a license must be residents, they must be of "good moral character"; and their fingerprints must be taken. 23 V.I.C. § 456. Certain people may not

---

[23] The category of persons authorized to possess firearms is further dichotomized into persons who must be licensed, and those who do not have to be licensed, to possess a firearm. *Hightree v. People*, 55 V.I. 947, 951 (V.I. 2011).

[24] First, Phillip cites *United States v. Daniel*, 518 F.3d 205, 208, 49 V.I. 1169 (3d Cir. 2008). However, *Daniel* does not state, let alone hold, that a person may possess a "licensed" firearm without himself being licensed to possess one. *See id.* (discussing authorization to possess ammunition, and framing the issue as "whether *Daniel* was authorized to possess" it (emphasis added)). Next, in *United States v. McKie*, 112 F.3d 626, 629, 36 V.I. 367 (3d Cir. 1997), the court never addressed the question of whether the license applies to the individual or to the weapon, but stated that "[i]t is the government's burden under V.I. Code tit. 14, § 2253 to prove *defendants were unauthorized to carry or possess* the guns." *Id.* (emphasis added). He also points out that in *Government of the Virgin Islands v. Soto*, 718 F.2d 72, 80 (3d Cir. 1983) — a case cited by *Daniel* and *McKie* — the Third Circuit did state that "[i]t is not known if the handgun used here was unlicensed, and hence, illegally carried," but that was not a holding of the case and it is properly considered mere dicta; the same is true of *Government of the Virgin Islands v. Dowling*, 633 F.2d 660, 670, 17 V.I. 623 (3d Cir. 1980). *Government of the Virgin Islands v. Bedford*, 671 F.2d 758, 763-64 (3d Cir. 1982), merely quotes the language of a trial court jury instruction, which is far from binding precedent on this court. *United States v. Lewis*, 672 F.3d 232, 56 V.I. 871 (3d Cir. 2012), does not even mention section 2253. *United States v. Ubiles*, 224 F.3d 213, 215 (3d Cir. 2000), mentions the statute, but only in passing, and in contradictory terms. Initially, the court states that Ubiles was charged under § 2253, "possession of an unregistered firearm in violation of Virgin Islands law," but it later describes it as "possessing an unlicensed gun," 224 F.3d at 218. In any case, the court never addressed the question of whether the person or the firearm must be licensed.

obtain such a license — felons; fugitives; addicts; those committed to a mental institution; persons unlawfully present in the United States; persons under a restraining order, and those convicted of domestic violence offenses. 23 V.I.C. § 456a. Similarly, section 470 provides a mechanism to report weapons purchased outside of the Territory by a *person* "qualified for a license to carry firearms in the Virgin Islands." 23 V.I.C. § 470(c). These restrictions operate to exclude certain persons — and not firearms — from being licensed.[25]

██ ██ From a reading of the entire scheme of licensing laws in context, *see In re Richards v. Elective Board of Frederiksted*, 1 V.I. 351, 354-55 (D.V.I. 1936) (statutes *in pari materia* must be harmonized unless there is a clear inconsistency between them), *McBean v. Gov't of the V.I.*, 32 V.I. 120, 126 (V.I. Terr. Ct. 1995) (same), we cannot discern any error on the part of the trial court. The Virgin Islands Legislature has required all persons who wish to possess firearms to be authorized to do so, whether by virtue of their position or occupation, or because they have obtained a license to possess a firearm. Because Phillip does not fall into either category, the trial court did not commit any error.

## 2. Reckless Endangerment

Phillip was convicted of reckless endangerment in the first degree. Section 625 of Title 14, which criminalizes reckless endangerment, provides in relevant part:

> A person is guilty of reckless endangerment in the first degree when, under the circumstances evidencing a depraved indifference to human

---

[25] That is not to say that the licensing and registration schemes established by the Legislature and expanded through regulation are entirely free from confusion. For example, section 457 indicates that the "licensee" must carry the license whenever "in possession of the firearm for which it was issued" and that the license must describe "the firearm authorized to be carried." 23 V.I.C. § 457(1), (4). Furthermore, the owner of the firearm must "present the firearm annually on the anniversary date of licensing for inspection" by the police department. 23 V.I.C. § 457(7). Section 455(e) refers to the "possession of an unlicensed firearm." 23 V.I.C. § 455(e). In addition, under section 466, a dealer may not sell a firearm to a person unless he shows a license which "contains an authorization for the purchase of such firearm." 23 V.I.C. § 466(a). The Firearms Register contains a list of "[e]very firearm authorized to be licensed under section 454 which is duly licensed." 23 V.I.C. § 473(b). However, even some of these rather unclear provisions support the People's position, as they make reference to "licensee[s]" and "holder[s] of [] license[s]." 23 V.I.C. §§ 457(1), 466(a).

life, he recklessly engages in conduct in a public place which creates a grave risk of death to another person.

14 V.I.C. § 625(a). Phillip challenges this conviction on several grounds, in a confusing and ultimately meritless argument. First, he contends that the People should have charged in the Information that the place where the crime took place was public. (Appellant's Br. 29.) Second, he states that the jury should have considered whether a car is private or public. (*Id.*) Finally, he intimates that it is impossible to create a grave risk of death if someone dies as a result of the assailant's conduct. (*Id.*)

 ██ The Amended Information *did* charge that the unlawful conduct occurred "in a public place." (J.A. 1691.) Furthermore, the trial court properly instructed the jury that they must find beyond a reasonable doubt that the shooting took place in a public place.[26] The jury had sufficient evidence on which to base this conclusion; the testimony establishes that the shooting happened outside in a public road near the public basketball courts in an urban community, i.e., a public place.

Finally, Phillip's argument that one cannot create a grave risk of death so long as someone dies is wholly without merit — James's death is archetypal proof that the shooting endangered lives. Furthermore, shooting from a vehicle into the dark near a basketball court in a residential area risked killing not just the occupants of the Wrangler, but any citizens who would be so unlucky as to be caught in the hail of bullets, including Jackson, who was standing outside the vehicle. Consequently, we find this argument unpersuasive.

### 3. *Legal Impossibility*

 Phillip argues that his conviction for first-degree assault must be vacated because it is legally impossible to assault a dead person. This argument is entirely meritless and can be disposed of very briefly. First-degree assault encompasses any assault committed with the intent to commit murder. 14 V.I.C. § 295(1). Assault is itself defined as

---

[26] This Court interpreted section 625(c)(2) — which defines "public place" as "a place to which the general public has a right to resort; but a place which is in point of fact public rather than private, and visited by persons and usually accessible to the public" — in *Augustine v. People*, 55 V.I. 678, 688-90 (V.I. 2011). In *Augustine*, we concluded that a public road constitutes a public place. *Id.*

"attempt[ing] to commit a battery" or "mak[ing] a threatening gesture showing in itself an immediate intention couple with an ability to commit a battery." 14 V.I.C. § 291; *see Ambrose v. People*, 56 V.I. 99, 103-04 (V.I. 2012). A battery is defined as the use of "unlawful violence upon the person of another with the intent to injure him." 14 V.I.C. § 292. The jury could have determined that Phillip assaulted James when he pointed a firearm at him in a threatening manner, and did so with the ability to injure and kill him. *Id.* Phillip could, therefore, be guilty of first-degree assault regardless of whether he missed or actually succeeded in killing the target of the assault. Of course, having been convicted of both first-degree assault and first-degree murder, Phillip was entitled to have one of the convictions stayed. The trial court did just that, choosing to stay the first-degree assault conviction.

## D. Section 104 of Title 14

### 1. *Multiple Convictions*

As a consequence of the shooting incident, Phillip was convicted of first-degree murder, first-degree assault, first-degree reckless endangerment and associated firearms charges. Phillip raises a challenge to these convictions based on section 104 of title 14 of the Virgin Islands Code, which states:

> An act or omission which is made punishable in different ways by different provisions of this Code may be punished under any of such provisions, but in no case may it be punished under more than one.

14 V.I.C. § 104.

This Court has previously decided that if more than one conviction is based on a single act, the trial court must "stay the imposition" of punishment for all but one of the convictions. *Williams v. People*, 56 V.I. 821, 834 n.9 (V.I. 2012). Here, the trial court already stayed the imposition of the sentence for the first-degree assault conviction and its associated firearm charge. However, the reckless endangerment conviction was based on the same act — the shooting of a firearm at the Wrangler in a public place — as the first-degree murder conviction.

Although the two offenses are based on the same act, Phillip's sentences for his convictions for first-degree murder and first-degree reckless endangerment may nonetheless be sustained. California — the

state from which the text of 14 V.I.C § 104 was borrowed — has long noted that the purpose of the prohibition on multiple punishments for a singular act is to "insure that the defendant's punishment will be commensurate with his criminal liability."[27] *Neal v. State*, 55 Cal. 2d 11, 9 Cal. Rptr. 607, 357 P.2d 839, 844 (1960), *overruled on other grounds by People v. Correa*, 54 Cal. 4th 331, 142 Cal. Rptr. 3d 546, 278 P.3d 809, 818 (2012).[28] Since "[a] defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person," the courts of California have carved out a "multiple victim" exception to section 104. *Id.*

 For the multiple-victim exception to apply, there must be an act of violence that harms or risks harming more than one person.[29] *Id.* " 'Whether a crime constitutes an act of violence that qualifies for the multiple-victim exception to section [104] depends upon whether the crime . . . is defined to proscribe an act of violence against the person.' " *People v. Solis*, 90 Cal. App. 4th 1002, 109 Cal. Rptr. 2d 464, 481 (2001) (second alteration in original). Reckless endangerment in the first degree necessarily requires an act that "creates a risk of death to another person." 14 V.I.C. § 625. As such, it is an act of violence for the purposes of the multiple-victim analysis. *See People v. Pantoja*, 122 Cal. App. 4th 1, 18 Cal. Rptr. 3d 492, 504 (2004) (affirming convictions for first-degree

---

[27] Although this interpretation was formally stated in cases issued after the Virgin Islands adopted section 104, it is nonetheless sufficiently persuasive that the Court will adopt it. There is no other discernible purpose that might have motivated the adoption of section 104 other than to ensure that a defendant receives punishment equal to his liability.

[28] The California Supreme Court overruled *Neal* in part on other grounds in 2012. *People v. Correa*, 54 Cal. 4th 331, 142 Cal. Rptr. 3d 546, 278 P.3d 809, 818 (2012). It made clear that the bar to multiple punishments does not apply when a defendant commits a singular act and violates a singular statute multiple times. In *Correa*, the defendant was found guilty of seven counts of being a felon in possession a firearm after police officers raided his home and found him with a cache of weapons. Because this interpretation of the multiple-punishment bar is not implicated here — since the defendant was convicted of violating more than one statute, rather than violating the same statute multiple times — we leave for another day the question of whether we would adopt the *Correa* limitation on section 104 challenges.

[29] The exception can be restated as follows: "Under this exception, even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim." *People v. Garcia*, 32 Cal. App. 4th 1756, 39 Cal. Rptr. 2d 73, 88 (1995) (internal quotation marks and citations omitted).

murder and child endangerment based on defendant's shooting of girlfriend where their daughter was present because the act was by a means likely to harm more than one person); *see also People v. Wiversoll*, No. C048607, 2006 Cal. App. Unpub. LEXIS 4761, at *11 (Cal. Ct. App. June 1, 2006) (unpublished) (concluding that because the definition of felony child endangerment requires the likelihood of great bodily injury or death, it is a violent crime for the purposes of California's version of section 104). When Phillip fired at the Vitara, he committed a single act of violence that harmed or risked harming more than one person, as one of the bullets fired by him and his companions killed James, and the act of firing created a risk of death to others in the vehicle or to anyone who might have been in the area of the public basketball court. *See People v. Felix*, 172 Cal. App. 4th 1618, 92 Cal. Rptr. 3d 239, 248-49 (Cal. Ct. App. 2009) (affirming multiple convictions where defendant fired into the window of a home at his intended target, but missed, and the bullets proceeded through different areas of the inhabited home, because he put at risk not only his target, but the target's family members and guests). For this reason, we conclude that the multiple-victim exception permits us to affirm Phillip's sentences for first-degree murder and first-degree reckless endangerment.

### 2. Validity of Section 2253

 Phillip argues that section 2253 of title 14 of the Virgin Islands Code violates the Revised Organic Act and conflicts with section 104 of title 14 because it permits multiple punishments. Section 2253 states, in relevant part, that the "penalties provided for violation of this section *shall be in addition* to the penalty provided for the commission, or attempt to commit, the crime of violence." 14 V.I.C. § 2253(a). This Court has addressed a similar challenge to section 2251. In *Ward v. People*, S. Ct. Crim. No. 2012-0077, 2013 V.I. Supreme LEXIS 9 (V.I. March 6, 2013), the Court rejected the appellant's argument that section 2251 conflicts with section 104 of title 14 and the Revised Organic Act. Section 2251 contains almost[30] the exact same language as that language in section 2253 to which Phillip objects: both statutes provide that the penalty for the firearm offense "shall be in addition to the penalty provided for the

---

[30] While section 2251 references only "the crime of violence," section 2253 includes "the *felony or* crime of violence." This minor disparity has no impact on the Court's analysis.

commission of, or attempt to commit, the crime of violence." 14 V.I.C. §§ 2251, 2253. Consequently, for the same reasons we rejected this challenge to section 2251 in *Ward*, 2013 V.I. Supreme LEXIS 9, at *4, we reject Phillip's challenge to section 2253.

### E. Alleged Trial Errors

#### 1. *Admission of the Camcorder Video*

Phillip objects to the admission of the Camcorder Video at trial. As discussed above, the Computer Monitor Video was relatively clear, but, because of its age, the police were unable to download or save a copy of the video. Consequently, they created the Camcorder Video, which the parties agree was not as clear.

 Phillip contends that the video should have been excluded because the probative value was outweighed by its potential prejudicial effect. Rule 403 limits the use of otherwise admissible evidence if "its probative value is substantially outweighed by a danger of . . . [*inter alia,*] unfair prejudice, confusing the issues, [or] misleading the jury." FED. R. EVID. 403. First, although the Camcorder Video was not as clear as the original computer video, the People elicited testimony from Petersen regarding what he observed on the clear Computer Monitor Video. He indicated that he saw Phillip in the Vitara not far from the area where the shooting occurred. Thus, the Camcorder Video cannot be more prejudicial than Petersen's testimony about what he saw on the original video. Furthermore, the Court cannot conclude that the trial court clearly erred when it determined that the jury would not be misled by the video and "could reach its own conclusions [about] whether the video depicts what the People [] argue that it does." (J.A. 1512.) *See State v. Dutton*, 83 Ariz. 193, 318 P.2d 667, 670 (1957) ("Uncertainty of identifying evidence goes to its weight, rather than its admissibility."). Finally, the trial court indicated that the video was not so blurry that its probative value would be meaningless. (J.A. 1512.) For these reasons, we conclude that the trial court did not abuse its discretion in admitting the Camcorder Video. *See, e.g., Barnes v. State*, 858 A.2d 942, 943-44 (Del. 2004) (conducting a Rule 403-type analysis and concluding that the surveillance video was "a relevant, reliable and fair depiction of the events as they occurred" even though it was converted to a slow-motion form from the original video).

## 2. Inconsistent Verdicts

Phillip argues that because the jury returned inconsistent verdicts, the jury must have been irrational, and so this Court should vacate all of his convictions. Phillip was charged with murder in the first degree and murder in the second degree. The jury found Phillip guilty of murder in the first degree, but found him not guilty of murder in the second degree. Phillip contends that to have found him not guilty of murder in the second degree, the jury must have determined that the People did not prove the elements of murder in the second degree beyond a reasonable doubt. Because murder in the second degree is a lesser included offense of murder in the first degree, he argues that the jury could not rationally have found the elements of the latter without having found elements of the former.

██ This Court recently addressed the issue of inconsistent verdicts in *People v. Faulkner*, 57 V.I. 327 (V.I. 2012).[31] In that case, the Court noted that it is a settled principle of law that an inconsistent verdict is not a sufficient reason for setting a verdict aside. *Id.* at 333-35 (citing *United States v. Powell*, 469 U.S. 57, 64-66, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984)). The Court affirmed Faulkner's convictions, despite inconsistent verdicts, because there was sufficient evidence to sustain them. *Id.* at 335. Similarly, in this case, there is sufficient evidence to sustain Phillip's convictions and we will not infer irrationality from the mere fact of inconsistency. Phillip's conviction for first-degree murder will not be set aside on this ground.

---

[31] Phillip cites to *Faulkner*, acknowledging its holding regarding "inconsistent verdicts." He attempts to distinguish *Faulkner*, arguing that the jury in this case must have been confused. However, as the *Faulkner* case indicates, it does not matter why the jury's verdicts were inconsistent. *Faulkner*, 57 V.I. at 334 (quoting *Powell*, 469 U.S. at 65 (declining to infer from inconsistent verdicts that the jury must have believed the defendant to be innocent, and suggesting, as an alternative, that "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion")). The Court will not reverse on this basis unless the record reveals that there was insufficient evidence to convict Phillip and, there being sufficient evidence, Phillip's argument must therefore fail.

### 3. *Denial of Phillip's November 7, 2011 Motion to Dismiss with Prejudice*

Phillip and Ostalaza were originally charged in an Information filed by the People on April 12, 2010. (J.A. 1660.)[32] The trial court scheduled jury selection for November 7, 2011, with the trial to begin on November 14, 2011. (J.A. 1660.) However, on October 24, 2011, the People moved to continue the jury selection and trial dates. (J.A. 1660.) The People indicated that the attorney handling the case had resigned and that the replacement attorney needed additional time to familiarize himself with the case. (J.A. 1660.) The trial court denied the Motion to Continue. (J.A. 1660.) Subsequently, the People indicated that they were ready to proceed to trial on November 7, 2011 — the date for which the trial was originally scheduled — but that the prosecuting attorney had a conflict — he was scheduled on November 14, 2011, to try an attempted murder case before another judge, for which a jury panel had already been selected. (Super. Ct. Nov. 4, 2011 Order, ST-11-CR-165.) They made a second request for a continuance, which was also denied. *Id.* (referencing an oral motion for continuance made at a November 2, 2011 pre-trial conference).

On November 3, 2011, the People filed a Motion to Dismiss the Information against Phillip and Ostalaza without prejudice. (J.A. 1660.) As justification for their Motion, the People stated that the interests of justice required such a dismissal. (J.A. 1660.) Ostalaza consented to the dismissal but Phillip opposed it, citing his right to a speedy trial. (Phillip's Nov. 4, 2011 Opp'n, ST-11-CR-165.) The court granted the Motion on November 4, 2011, and dismissed the case. (Super. Ct. Nov. 4, 2011 Order, ST-11-CR-165.) In the November 4, 2011 Order, the Superior Court recited the procedural history of the case, and noted that some delay had already occurred because Morton's case had been severed. (Super. Ct. Nov. 4, 2011 Order, ST-11-CR-165.) The court noted that it had the discretion whether to dismiss the case and, if it dismissed the case, whether to dismiss with prejudice or without prejudice. (Super. Ct. Nov. 4, 2011 Order, ST-11-CR-165.) Ultimately, the court decided to dismiss

---

[32] Phillip did not provide the Court with the relevant Information, the People's Motion to Continue, the People's Motion to Dismiss the original Information without Prejudice, or Phillip's Motion to Dismiss the new Information without prejudice. However, this Court directed the Superior Court to provide those documents, which the Superior Court transmitted on April 3, 2013. V.I.S.Ct. R. 11(c).

the case *without* prejudice because: the family of the victim should not be penalized by the People's "transgressions" or "neglect"; there was a potential that judicial economy could be promoted if, in the future, the case could be re-combined with Morton's case for trial; Phillip could obtain discovery documents that he had not yet obtained from the People, or would have more time to consider those items he had only recently obtained; and Ostalaza had not objected. (Super. Ct. Nov. 4, 2011 Order, ST-11-CR-165.)

Subsequently, on November 16, 2011, the trial court required the People to pay a sanction of $725.00 to cover Phillip's costs. (Super. Ct. Nov. 16, 2011 Order, ST-11-CR-165.) On November 21, 2011, the People filed a new Information charging Phillip and Ostalaza with "essentially . . . the same charges" as the first Information. (J.A. 1661.) On December 7, 2011, Phillip moved to dismiss the new Information, a Motion which Ostalaza joined. Phillip argued that the People's Motion to Dismiss the original case was made in bad faith, and was filed to gain a tactical advantage because the People — having received an adverse ruling on their Motion to Continue — wanted to have more time to prepare for trial. Phillip objects to the trial court's denial of that motion on May 7, 2012. The Court reviews the dismissal or refusal to dismiss an information for abuse of discretion. *In re Richards*, 213 F.3d 773, 787, 42 V.I. 469 (3d Cir. 2000); *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984). Before evaluating the trial court's application of the law, this Court must determine what law applies. The Superior Court relied on Rule 48 of the Federal Rules of Criminal Procedure,[33] which provides in relevant part:

> (a) The government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent.[34]

---

[33] The Superior Court's initial dismissal of ST-11-CR-165 did not reference any rules. (Super. Ct. Nov. 4, 2011 Order, ST-11-CR-165.) Once that case was dismissed, and a new case (ST-11-CR-669) was initiated and assigned to a new judge, the new judge relied on Rule 48 to determine whether the newly filed Information should be dismissed per Phillip's request.

[34] The Superior Court has adopted by reference those provisions of the Federal Rules of Criminal Procedure that are not inconsistent with a local law or rule. SUPER. CT. R. 7. Superior Court Rule 128(b) states, "No criminal case filed in the court, including traffic citations, shall be dismissed upon motion by any party except upon a determination by the

█ Pursuant to this Rule, the trial court may deny a motion to dismiss, or may grant the dismissal but with prejudice only, to protect a defendant from harassment by a prosecutor acting in bad faith, to protect "the public interest in the fair administration of criminal justice and . . . to preserve the integrity of the courts. . . . [Consequently,] [a] court is generally required to grant a prosecutor's Rule 48(a) motion to dismiss unless dismissal is 'clearly contrary to manifest public interest.' " *United*

Court that the dismissal is in good faith, in the public interest, and in the interest of justice." However, without deciding whether we concur with the reasoning of the decision, we note that the Third Circuit rejected Rule 128(b), concluding that the rule exceeded the trial court's rule-making authority. *In re Richards*, 213 F.3d 773, 784, 42 V.I. 469 (3d Cir. 2000). *In re Richards*, as a decision of the Third Circuit Court of Appeals, was binding on the Superior Court, even if it is not binding on this Court. *See Najawicz v. People*, S. Ct. Crim. No. 2012-0109, 2013 V.I. Supreme LEXIS 12, at *18 (V.I. March 15, 2013) (indicating that Third Circuit decisions are binding on the Superior Court when they are rendered in the court's capacity as the "*de facto* court of last resort in the Virgin Islands"). Thus, the trial court could not have applied Superior Court Rule 128(b) when deciding the motions to dismiss.

Arguably, Superior Court Rule 131 could also apply. That Rule states:

> Where the Government is not prepared to proceed with trial on the trial date, the judge may direct that the complaint or information be heard on a continued date and a notice thereof be served on the complaining witness, all defendants and all other known witnesses by subpoena. Upon failure of the Government to prosecute on the day set, the judge may order the complaint dismissed.

By its plain text, Superior Court Rule 131 appears to apply to motions to dismiss on the date of the trial, or on a continued trial date, when the government is unprepared to proceed, rather than dismissals during the pretrial period generally. But more importantly, because the Rule does not explicitly include any limitation on the government's power to dismiss and refile their information, we would necessarily read such a limitation into the Rule in order to protect the integrity of the judicial system and ensure fairness for the defendant. *In re Richards*, 213 F.3d at 788 (referencing the "independent rights, interests and duties that a court may protect"); *Hoskins v. Maricle*, 150 S.W.3d 1, 15-16 (Ky. 2004) (emphasizing the importance of "preserv[ing] the essential judicial function of protecting the public interest in the even-handed administration of criminal justice," by implementing a check on the power of the Executive (quoting *United States v. Cowan*, 524 F.2d 504, 512 (5th Cir. 1975)). Indeed, it could be argued that there is no need for any rule: the courts, of their own power, could choose to deny a motion to dismiss, or require it to be with prejudice, if they determined that their processes were being abused by the Executive to achieve some improper purpose. Consequently, if Rule 131 applied, the standard we would use to evaluate the trial court's exercise of its discretion would not be substantively different than the standard applied for a determination under Federal Rule of Criminal Procedure 48. For this reason, we do not decide which rule should govern the situation presented here. Because there is no case law interpreting Rule 131, and there is abundant precedent applying Rule 48, we will analyze the trial court's actions under the Rule 48 standard.

*States v. Carrigan*, 778 F.2d 1454, 1463 (10th Cir. 1985) (collecting cases); *see also Rinaldi v. United States*, 434 U.S. 22, 30, 98 S. Ct. 81, 54 L. Ed. 2d 207 (1977) (indicating that the "salient issue" is whether the government is acting in good faith); *In re Richards*, 213 F.3d at 786-87. The trial court should refuse to grant the People's dismissal request only in the "rarest" of cases, for it is the People who are presumed to be the best judge of where the public interest lies with respect to a criminal prosecution. *In re Richards*, 213 F.3d at 786 (" '[F]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought' " (quoting *Newman v. United States*, 382 F.2d 479, 480, 127 U.S. App. D.C. 263 (D.C. Cir. 1967) (Burger, J.))); *see also United States v. Jacobo-Zavala*, 241 F.3d 1009, 1012 (8th Cir. 2001) ("A [] court's discretion to deny leave [to dismiss] is sharply limited by the separation of powers balance of Rule 48(a) itself, because a [] court that denies leave to dismiss an indictment is essentially exercising judicial review of the prosecutor's exercise of executive authority.").

 Applying these standards, we conclude that the trial court did not err in initially dismissing the case without prejudice, or eventually refusing to dismiss the new case with prejudice. Here, there is no showing of bad faith.[35] As the trial court recounted the proceedings in its November 4, 2011 Order, the People moved to dismiss the case because the newly assigned attorney had a conflicting trial already set — with a jury selected — to begin on the date that the jury selection in the underlying case was set to take place. Later, the court, in its May 7, 2012 Order, suggested a different motive:[36] the court considered that the People may have moved to dismiss in order to gain a continuance because the

---

[35] Indeed, the trial court explicitly found that the People were not acting in bad faith, a factual finding that would not be reversed unless it is clearly erroneous, and there is no evidence to suggest it is. (J.A. 1662.)

[36] The trial court came to two different conclusions about the People's purpose, perhaps because the orders were issued by different judges. The judge presiding over ST-11-CR-165 heard the People's oral motion on November 2, 2011, and issued the November 4, 2011 Order, which recites the People's contention that they were ready for trial but had a scheduling conflict. Once the new case, ST-11-CR-669, was initiated, it was assigned to a new judge, who analyzed the propriety of dismissing the new case based on the assumption that the People had originally moved to dismiss the old case because they needed more time to prepare for trial.

newly assigned attorney had not had time to become sufficiently familiar with the case.[37] In either case, there is no indication that the People were acting in bad faith, or were attempting to harass the defendant. They did not dismiss the case for altogether no reason, nor did they appear to gain any real tactical advantage that they would not have otherwise had if the court had been able to reschedule the trial date. *Cf. United States v. Smith*, 55 F.3d 157, 159 (4th Cir. 1995) (providing examples of bad faith, such as acceptance of a bribe, personal dislike of the victim or accuser, or dissatisfaction with the empaneled jury); *United States v. Salinas*, 693 F.2d 348, 353 (5th Cir. 1982) (finding bad faith where the government dismissed the case in order to obtain "a 'better' jury, a jury more to its liking"); *Hoskins*, 150 S.W.3d at 21 (indicating that wishing to "attend a social event rather than trial" would be bad faith). It is possible, of course, that the People had some undisclosed improper motive; however, there is none apparent from the record, and the Court will not presume bad faith.[38] *Rinaldi*, 434 U.S. at 30 ("Our examination of the record has not disclosed (and we will not presume) bad faith. . . ."); *Jacobo-Zavala*, 241 F.3d at 1012 ("[T]he presumption of regularity supports [the Executive's] prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Salinas*, 693 F.2d at 352 (5th Cir. 1982) (presuming that the government acted in good faith in seeking a dismissal).

---

[37] In *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984), which Phillip cited in his brief, the Tenth Circuit found unavailing the prosecutor's explanation that he sought dismissal because he was dissatisfied with the state of the investigation. However, that case is readily distinguishable. First, the *Derr* motion for dismissal occurred on the day of trial, which would unquestionably visit more prejudice on the defendant than a motion made with almost two weeks before trial. Second, even if the trial court was correct in its May 7, 2012 Order that the People moved to dismiss the case not because of a scheduling conflict but because the newly assigned attorney was not ready, this is certainly a more excusable motivation. Where the prosecutor assigned to the two-defendant, first-degree murder case resigns shortly before trial, it is understandable that the newly assigned attorney — through no fault of his own — would need additional time to prepare. After all, this is a case the trial of which eventually lasted five days and produced a record in excess of 1600 pages. Unlike the *Derr* case, the prosecutor here was not generally dissatisfied with his own investigation of the matter; he simply needed additional time to become familiar with it.

[38] Both trial judges complained of the actions of the Attorney General's office. (Super. Ct. Nov. 16, 2011 Order, ST-11-CR-165 (referencing the "transgressions and/or neglect" of the Attorney General's Office); J.A. 1661 ("admonish[ing] the People for not handling the transition from one attorney to another in a more effective and seamless manner").) However, neglect and mismanagement are not substitutes for, or synonymous with, bad faith.

Furthermore, the initial dismissal of the prior case, and the subsequent refusal to dismiss the new case, were not contrary to the public interest or to the interest of justice. Here, there was a singular dismissal, rather than a cycle of repetitively dismissing and refiling the case, which weighs against a finding that the dismissal interfered with the administration of justice or otherwise unduly harassed Phillip. *Cf. Salinas*, 693 F.3d at 351 n.15 ("It is obvious that the public interest is not served by harassing a defendant."). Furthermore, while Phillip decried the initial dismissal as unjust in part because of the time and costs expended in preparation for trial, the court required the People to compensate Phillip $725.00 for the costs incurred, and invited him to file an additional motion for costs and fees "[i]f additional burdensome costs were accrued to the Defendant due to the dismissal and recharging." Moreover, although Phillip contended that his speedy trial rights would be violated by a dismissal (Phillip's Nov. 4, 2011 Opp'n, ST-11-CR-165), once the new case was initiated he never filed a speedy trial motion, nor is there any indication on the record that he objected to any of the court's scheduling orders, including those setting the new trial date for May 2012. Finally, the public interest weighs against dismissing a first-degree murder case against two co-defendants under these circumstances.

 We echo the trial court's concern regarding mismanagement in the Attorney General's office which prejudices the defendants or interferes with the administration of justice. In a case with different facts — where the record demonstrates that the People were acting in bad faith, or were attempting to harass the defendant or gain some advantage, or where the record does not so clearly demonstrate the strength of the public interest in the reviving of the case — we would exercise our power and require a dismissal requested by the People to be *with* prejudice. This is not such a case, however. For these reasons, we do not find that the trial court abused its discretion when it refused to dismiss the re-filed Information against the defendants. *See DeMarrias v. United States*, 487 F.2d 19, 21 (8th Cir. 1973) (noting that a dismissal pursuant to Rule 48(a) "does not bar subsequent prosecution for criminal acts described in [the dismissed] indictment").

Finally, having found no trial errors, there is no basis to reverse under the "cumulative error" doctrine as requested by Phillip.

## III. CONCLUSION

Because the People provided sufficient evidence for a reasonable jury to have convicted Phillip of the crimes charged, and because none of the alleged trial or sentencing errors requires reversal, we will affirm the convictions.