In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3009

JULIAN LOPEZ,

*Petitioner-Appellant*,

*v.*

MICHAEL THURMER,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:05-cv-00998—**Rudolph T. Randa**, *Chief Judge*.

ARGUED SEPTEMBER 26, 2008—DECIDED JULY 22, 2009

Before RIPPLE, MANION and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Julian Lopez appeals the denial of his petition for a writ of habeas corpus. In June 2000, Mr. Lopez was convicted in Wisconsin state court on one count of first-degree intentional homicide. After the state trial court denied Mr. Lopez's first post-conviction motion and denied a supplemental motion, the Court of Appeals of Wisconsin affirmed Mr. Lopez's conviction. The Supreme Court of Wisconsin denied his petition for review.

Mr. Lopez then filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Wisconsin. The district court denied the petition and also denied a certificate of appealability. We granted a certificate of appealability. We now hold that the Wisconsin appellate court applied a methodology based on an unreasonable reading of the decisions of the Supreme Court of the United States. As a result, the Wisconsin court improperly endorsed the trial court's abnegation of its non-delegable responsibility to determine the appropriate security measures for a jury view of the crime scene and other various locations implicated in the case. Despite this error, however, the *result* reached by the Wisconsin court does not run afoul of any clearly established principle of federal law. In any event, any error was harmless. Accordingly, we affirm the denial of Mr. Lopez's petition.

# I

# BACKGROUND

## A.

In March 1999, Anthony Davis was shot and killed outside the Garden Fresh Foods building in Milwaukee. In September of that year, Mr. Lopez was charged with first-degree intentional homicide after three witnesses came forward to identify him as one of the men who shot Davis. His trial took place in June 2000. At a pre-trial hearing, the prosecution requested a "jury view" of the crime scene and several other locations. The court granted the request.

At another pre-trial hearing, the prosecution requested that the jury be sequestered. The prosecution represented to the court that the defendant was a member of a heavily armed drug organization, some members of which had not yet been federally indicted; that some of the organization's weapons had not been recovered; and that there had been discussion within the organization about "taking action against witnesses." R.50 at 6-7. The court ordered that the jury be sequestered.

At the beginning of the trial, the court informed the jury about the jury view. The court instructed the jurors that what they would see at the locations was not evidence and was not to be considered as such. Immediately after this instruction was given, the jury view took place. The judge accompanied the jury and the parties to five different locations, including the crime scene and Mr. Lopez's house. On the way to the first location, the court instructed the jurors that the security they would see at these locations was "to preserve the scene, that this is not unnatural security that we go through," and that they should "not draw any conclusions from that." R.53 at 25.

Mr. Lopez was driven to the scene in a separate van, which was also occupied by four police SWAT team officers who were assigned to guard him. At two of the locations, Mr. Lopez remained in the van because he did not want the jury to see him surrounded by such a heavy security detail. At the other three locations, however, the court ordered Mr. Lopez out of the van. At these locations the jurors saw Mr. Lopez surrounded by the four SWAT officers, who were dressed in military

fatigues and carried "M-16 type" weapons. R.53 at 23. At one of the locations, an officer pointed his gun and shouted at a person who appeared in an open window. Police officers also were deployed on the rooftops of nearby buildings. Mr. Lopez and his counsel were not informed until the morning of the jury view that such intensive security precautions would be taken.

In court later that day, after the jury view, Mr. Lopez's counsel objected to the level of security at the jury view and moved to dismiss the case. He complained that the security arrangements had been worked out in ex parte discussions between the Sheriff's Department and the prosecution, based on information that was not shared with the defense. The prosecution did not deny that such communications took place, but responded that it had no control over decisions about security, as such decisions were the province of the Sheriff's Department alone.

The court admitted that it, too, was unaware of the planned security measures: "The Court wasn't informed until just beforehand also that there potentially could be security—we went ahead and did it based upon the organization of the Department, which I believe it did a good job, so I'm not going to spend a lot of time on this." R.53 at 28-29. The court denied the motion to dismiss, but again instructed the jury that it was "not supposed to draw any negative inference from the security that is out there." R.53 at 30.

The trial continued, culminating in Mr. Lopez's conviction on one count of first-degree intentional homicide. The court sentenced him to life in prison.

Mr. Lopez filed a motion in the trial court for post-conviction relief. He argued, among other things, that allowing the jury to see him under such heavy security at the jury view violated his right to a fair trial. The court denied the motion; it found that the security was appropriate under the circumstances. The court also noted that the jury was instructed repeatedly not to draw any negative inference from the level of security at the jury view.

**B.**

Mr. Lopez appealed to the Court of Appeals of Wisconsin, which affirmed his conviction. The court reasoned that, although a trial court generally is required to state its reasons for requiring a defendant to wear restraints in the courtroom, "this standard . . . is often relaxed in an out-of-court setting, depending on the circumstances." *State v. Lopez*, No. 03-1886-CR, 2004 WL 1533992, at *2 (Wis. Ct. App. June 29, 2004) (unpublished disposition) (citing *State v. Cassel*, 180 N.W.2d 607, 611-12 (Wis. Ct. App. 1992)). The court maintained that, unlike the decision to restrain a defendant in the courtroom, which is the province of the trial judge, security during a jury view "is a matter for the sheriff or the police to determine because such custodian is responsible for the safekeeping of the accused." *Id.* at *3 (citing *Cassel*, 180 N.W.2d at 611). The court concluded that the precautions taken during the jury view were reasonable and that any prejudice Mr. Lopez might have

suffered was cured when the trial court instructed the jury not to draw any inferences.

The court also rejected Mr. Lopez's argument that he should have been given advance notice of the planned precautions and an opportunity to provide input into the security decision. The court noted that the prosecution's motion for a jury view was granted approximately three weeks before the trial began. The court also pointed out that Mr. Lopez was aware of the trial court's heightened concern about security in the case because of the court's decision to sequester the jury and by his attorney's admission that he knew there would be "extra security" at the jury view. *Id*. Based on these considerations, the court concluded that "[Mr.] Lopez's counsel had more than enough time to consult with Lopez about the implications of the viewing trip, and sufficient opportunity to consider the consequences of the potentially dangerous circumstances presented, and what security precautions may be taken." *Id.* Accordingly, the court affirmed Mr. Lopez's conviction. He subsequently filed a petition for review with the Supreme Court of Wisconsin; that petition was denied.

## C.

Mr. Lopez then petitioned for a writ of habeas corpus in the United States District Court for the Eastern District of Wisconsin. The district court denied the petition; it held that, although the security measures were "severe," they were justified under the circumstances and did not unduly prejudice Mr. Lopez in the eyes of the jury. *Lopez*

*v. Pollard*, No. 05-C-998, 2007 WL 1991043, at *3 (E.D. Wis. July 5, 2007). The court further held that any prejudice was mitigated by the trial judge's instructions to the jury. The district court also denied Mr. Lopez's request for a certificate of appealability.

We granted a certificate of appealability on the issue of "whether [Mr. Lopez] was denied his right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments by the state's use of excessive security measures during the jury view of the locations relevant to the crime." *Lopez v. Thurmer*, No. 07-3009 (7th Cir. Jan. 4, 2008) (unpublished order).

## II

## DISCUSSION

### A.

Mr. Lopez seeks a writ of habeas corpus on the ground that the security measures during the jury view deprived him of a fair trial by making him appear dangerous—and, therefore, guilty—in the eyes of the jury. The Wisconsin state courts have considered and rejected this argument; it is, therefore, adequately preserved for federal review.

Under the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), in reviewing a state court's decision on a federal constitutional issue, we may grant habeas relief only if the state's adjudication of the issue:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is that of the last state court to review the issue. *Gonzales v. Mize*, 565 F.3d 373, 379 (7th Cir. 2009). Because the Supreme Court of Wisconsin denied review, the Court of Appeals of Wisconsin was the last state court to review Mr. Lopez's appeal on the merits. Thus, the issue before us is whether the Wisconsin Court of Appeals' decision, which held that the security measures did not violate Mr. Lopez's due process right to a fair trial, "was contrary to, or involved an unreasonable interpretation of, clearly established federal law, as determined by the Supreme Court of the United States." *Id.*

For purposes of habeas corpus review, "[c]learly established federal law" means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). This includes the holdings of Supreme Court decisions as well as "legal principles derived from th[ose] holdings." *Samuel v. Frank*, 525 F.3d 566, 569 (7th Cir. 2008).

Mr. Lopez contends that three Supreme Court cases, taken together, establish the principle that a defendant has a "constitutional right to appear in the garb of inno-

cence before the jury deciding his case." Appellant's Br. 17 (citing *Illinois v. Allen*, 397 U.S. 337 (1970); *Estelle v. Williams*, 425 U.S. 501 (1976); *Holbrook v. Flynn*, 475 U.S. 560 (1986)).

In *Illinois v. Allen*, 397 U.S. 337 (1970), the Supreme Court held that the Constitution might permit, under some circumstances, a trial court to order that an obstreperous defendant be bound and gagged in the courtroom during his trial. The Court expressed reservations about this method of control; it acknowledged that "even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort." *Id*. at 344. The Court also recognized the possibility "that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant." *Id.* Thus, although the Court refused to rule out the possibility that binding and gagging might be the most reasonable way to deal with a disruptive defendant under certain circumstances, it made clear that such a measure would be appropriate only in the most extreme of cases.

In *Estelle v. Williams*, 425 U.S. 501, 506 (1976), the Court held that requiring a defendant to wear "identifiable prison clothes" violated his due process right to a fair trial. The Court wrote: "The constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 504-05. The Court also noted that, unlike the physical

restraints it approved in *Allen*, requiring the defendant to don prison garb furthers no essential state policy.

In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Court held that the defendant's right to due process was not violated by the presence of four uniformed state troopers in the first row of the spectator section of the courtroom. Although the Court "d[id] not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chance of receiving a fair trial," it "simply [could not] find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section." *Id*.

Mr. Lopez reads *Allen* and *Williams* as establishing that it is inherently prejudicial to require a defendant to stand trial in shackles or prison clothing. He also points to the Court's suggestion in *Holbrook* that "a roomful of uniformed and armed policemen" would prejudice a defendant's right to a fair trial; he contends that the presence of uniformed SWAT officers carrying assault rifles created a similar risk of prejudice.

The State of Wisconsin, through Respondent Michael Thurmer (the "State"), responds that these cases do not add up to a clearly established principle barring the use of heightened security measures during a jury view. The State points out that these cases all involved security measures in the courtroom, and notes that "the Supreme Court has never addressed whether security measures outside the courtroom . . . may have an effect on a defendant's due process rights." Appellee's Br. 14.

**B.**

At the outset, we find the state trial court's "hands-off" approach to fashioning the appropriate level of security at the jury view extremely troubling. As far as the record reveals, the trial court made no effort to scrutinize with any care the security measures in which the defendant would be seen at the jury view. By the court's own admission, it did not even know what security measures the Sheriff's Department intended to employ until the morning of the jury view. In effect, the state trial court surrendered to the Sheriff's department its responsibility to decide the level of security that was reasonable during the trial. The court's laissez-faire approach also deprived Mr. Lopez of a meaningful opportunity to argue, before the fact, that the planned security measures were excessive. As we have noted earlier, the Court of Appeals of Wisconsin explicitly sanctioned the trial court's total abnegation of its responsibilities to law enforcement authorities.

Furthermore, we believe that the Court of Appeals of Wisconsin unreasonably interpreted the governing precedent of the Supreme Court of the United States. We read *Allen*, *Williams* and *Holbrook* as establishing the principle that *trial courts* have a constitutional responsibility to balance the need for heightened security during a criminal trial against the risk that the additional precautions will prejudice the defendant in the eyes of the jury. It is that judicial reconciliation of the competing interests of the person standing trial and of the state providing for the security of the community that, according to these

cases, provides the appropriate guarantee of funda-
mental fairness. This was implicit in Justice Black's
opinion for the Court in *Allen*, and later was made ex-
plicit in Chief Justice Burger's opinion for the Court in
*Williams*: "In the administration of criminal justice, *courts*
must carefully guard against dilution of the principle
that guilt is to be established by probative evidence and
beyond a reasonable doubt." *Williams*, 425 U.S. at 503
(emphasis supplied). The Chief Justice continued:

> The actual impact of a particular practice on the
> judgment of jurors cannot always be fully deter-
> mined. But this Court has left no doubt that the proba-
> bility of deleterious effects on fundamental rights
> calls for close judicial scrutiny. . . . *Courts* must do
> the best they can to evaluate the likely effects of a
> particular procedure, based on reason, principle, and
> common human experience.

*Id*. at 504 (emphasis supplied). More recently, in applying
the principles of *Allen, Williams* and *Holbrook* to sen-
tencing proceedings, the Supreme Court wrote:

> Lower courts have disagreed about the specific pro-
> cedural steps a trial court must take prior to shackling,
> about the amount and type of evidence needed to
> justify restraints, and about what forms of prejudice
> might warrant a new trial, but they have not ques-
> tioned the basic principle. They have emphasized
> the importance of preserving trial court discretion
> (reversing only in cases of clear abuse), but they
> have applied the limits on that discretion described
> in *Holbrook, Allen*, and the early English cases. In

light of this precedent, and of a lower court consensus disapproving routine shackling dating back to the 19th century, it is clear that this Court's prior statements gave voice to a principle deeply embedded in the law. We now conclude that those statements identify a basic element of the "due process of law" protected by the Federal Constitution. Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury *absent a trial court determination, in the exercise of its discretion*, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Deck v. Missouri*, 544 U.S. 622, 629 (2005) (emphasis supplied).

Nothing in the Supreme Court's pronouncements, or in the reasoning supporting those decisions, suggests in the slightest way that this judicial responsibility to reconcile the competing interests of the individual and the state is confined within the courtroom walls.[1] The

---

[1] The State suggests in its brief that a court's responsibility to ensure that security measures are reasonable during trial does not extend to proceedings that take place outside the courtroom. To support this proposition, the State relies on several cases from other circuits. *See* Appellee's Br. 21 (citing *Allen v. Montgomery*, 728 F.2d 1409, 1413 n.3 (11th Cir. 1984); *United*

(continued...)

Court's focus in these cases was not on the venue in which the measures at issue were taken; it was aimed at protecting the fairness of the criminal proceeding—on what the jury saw and how what it saw might affect the jury's impression of the defendant's guilt or innocence.[2]

---

[1]  (...continued)
*States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995); *United States v. Fahnbulleh*, 748 F.2d 473, 477 (8th Cir. 1984)).

None of those cases, however, holds that the court may delegate decisions about security during trial proceedings that take place outside of the courtroom. Those cases simply hold that law enforcement officials have a role in determining the security provisions that are appropriate when the defendant must be transported—before and after trial proceedings—between the courtroom and the jail where he is being detained. *See Allen*, 728 F.2d at 1413 n.3 ("[W]e find no constitutional error in permitting the sheriff to decide what forms of security were necessary *to bring the defendant safely to trial*." (emphasis supplied)); *Olano*, 62 F.3d at 1190 (finding no prejudice to the defendant where the jury briefly may have seen him in handcuffs as he was led into the courtroom at the beginning of trial proceedings); *Fahnbulleh*, 748 F.2d at 477 (finding no prejudice where prospective jurors may have seen a United States Marshal escort the defendant to the courtroom door in handcuffs).

[2]  We have noted before, in interpreting *Williams* and its progeny, that although a trial court's decisions about the required level of security during a trial are entitled to deference, those decisions must be made by the court itself; the trial judge "may not delegate his discretion to another party." *United States*

(continued...)

Accordingly, faithfulness to the rationale of the Supreme Court's decisions requires that a criminal defendant's right to be free from unreasonable prejudice during his trial must apply to *all* trial proceedings, including those, such as the jury view in this case, that take place outside of the courtroom.[3] In essence, the Court of Appeals of Wisconsin allowed the Sheriff's Department to judge its own case. The constitutional infirmity of such a methodology is, to put it mildly, firmly established.[4]

---

[2] (...continued)
*v. Brooks*, 125 F.3d 484, 502 (7th Cir. 1997) (quoting *Lemons v. Skidmore*, 985 F.2d 354, 358 (7th Cir. 1993)).

[3] The State relies on the Supreme Court's decision in *Carey v. Musladin*, 549 U.S. 70, 75-76 (2006), for the proposition that the principles established in *Williams* and its progeny did not constitute clearly established federal law under 28 U.S.C. § 2254 (d)(1). The Court's reasoning in *Carey*, however, was based on considerations that are not relevant here. Notably, the court emphasized that the reason for its holding was that the case concerned the conduct of private, not state, actors and therefore did not implicate the basic due process analysis at stake in those cases. *Id*. Nothing in *Carey* suggests that the principles of *Williams* and later cases do not extend to criminal trial proceedings outside the courtroom. Indeed, the Court's emphasis on the well-established due process analysis, in which the courts balance the interests of the individual against *state* interests, serves to reinforce the long-standing nature of that methodology in due process analysis.

[4] Of course, there is no constitutional prohibition on the trial court's giving significant weight to the view of law enforce-

(continued...)

### C.

Although the Court of Appeals of Wisconsin applied the wrong methodology in deciding the federal due process issue before it, it is not the court's methodology but its result that we review to determine whether its judgment was so infirm as to require the issuance of a federal writ of habeas corpus. *See, e.g., Malinowski v. Smith*, 509 F.3d 328, 339 (7th Cir. 2007) (affirming the denial of a petition for habeas corpus because "even if the Wisconsin Court of Appeals had applied the wrong standard, the proper standard results in the same conclusion.").

The Court of Appeals of Wisconsin held that the security procedures employed did not offend due process because they "were not unreasonable given the security risks associated with this case." *Lopez*, 2004 WL 1533992, at *3. Under the standard of review set forth in AEDPA, we can upset this determination and grant the writ of habeas corpus only if the state court's determination was contrary to clearly established federal law. 28 U.S.C. § 2254(d).

---

[4] (...continued)
ment authorities as to the necessity of certain security measures. Indeed, such respect for the advice of those charged with protecting public safety is prudent. However, the actual due process determination must be made by the judicial officer. Law enforcement officials hardly can be said to be neutral in balancing the rights of the defendant against their own view of necessary security measures.

Upon review of the record, and mindful of AEDPA's deferential standard of review, we cannot conclude that the Court of Appeals of Wisconsin acted contrary to clearly established law when it concluded that the security measures taken at the jury view were reasonable. Several considerations lead us to this conclusion. At the outset, it is important that we keep in mind that the analysis set forth by the Supreme Court's cases requires a *balancing* of the need for security and order during a trial against any prejudice that the defendant might suffer in the eyes of the jury. This sort of inquiry is necessarily a fact-specific one, and, therefore, the Supreme Court understandably has not set forth, with any specificity, the factors that a trial court ought to consider, or the weight that ought to be given to any of those factors. Consequently, there are few "clearly established" guidelines for federal courts to employ in reviewing state courts' decisions about the propriety of security measures at trial.[5]

---

[5] We also note that the Supreme Court has cautioned the courts of appeals against trying to anticipate how it will rule. *See Wright v. Van Patten*, 552 U.S. 120 (2008) (rejecting this court's application of the *United States v. Cronic* standard for ineffective assistance of counsel to a criminal defendant's habeas petition because the Supreme Court had not yet addressed expressly the applicability of *Cronic* to cases similar to the defendant's); *Carey*, 549 U.S. 70 (2006) (rejecting the Ninth Circuit's extension of the Supreme Court's inherent-prejudice analysis to cover conduct by private actors as well as state

(continued...)

Restrictions imposed on us by the federal habeas statute aside, the district court correctly noted that a trial court must have wide discretion in determining what security measures are necessary to prevent disruption of the courtroom, harm to those attending the trial, escape of the defendant and the commission of other crimes. *See Allen*, 397 U.S. at 343.[6] Moreover, as Justice Marshall pointed out in *Holbrook*, the use of security officers at a trial venue is qualitatively different from other security arrangements that are imposed on the defendant alone:

> The chief feature that distinguishes the use of identi- fiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is par- ticularly dangerous or culpable. Jurors may just

---

[5] (...continued)
actors because the Supreme Court had never expressly consid- ered whether the analysis should apply to private actors).

[6] Despite the trial court's mishandling of the issue before the jury view, we do have in the record its *post-facto* estimation, albeit laconically stated, that the security measures were reasonable. We therefore have some minimal determination by the judicial officer on the scene that the rights of the defen- dant were protected adequately.

> as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.

*Holbrook*, 475 U.S. at 569.

Trial courts should have, in any event, significantly more latitude in gauging the appropriate security measures for a jury view outside the courtroom. Although there is a significant amount of case law and professional material on the proper maintenance of security in the courtroom environment,[7] jury views outside the courtroom necessarily require a significant recalibration of the security/prejudice balance. The trial judge is faced with an unfamiliar locale and with a multifaceted security problem that bears little resemblance to the more contained situation presented by the conventional courtroom. Jurors generally will understand and appreciate this distinction, and, therefore, will be less likely to draw conclusions about the defendant's guilt upon seeing heightened security measures in effect. Thus, the decision to impose this kind of extra security might well

---

[7] *See, e.g., Deck v. Missouri*, 544 U.S. 622 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501, 504 (1976); *Illinois v. Allen*, 397 U.S. 337 (1970); *United States v. Van Sach*, 458 F.3d 694, 699-700 (7th Cir. 2006). *See also Influences On The Jury*, 38 Geo. L. J. Ann. Rev. Crim. Pro. 560, 568 (2009); Wayne R. LaFave et al., 6 Civil Procedure § 24.2(e) (3d ed. 2007).

be constitutionally reasonable for a proceeding outside the courtroom, even though the principles enunciated in *Allen* and *Williams* rarely would permit such restraints in the courtroom.

In light of these considerations, we cannot conclude that the Court of Appeals of Wisconsin acted contrary to, or applied unreasonably, clearly established federal law when it determined that the security measures taken here did not violate Mr. Lopez's federal constitutional right to due process of law. Even aside from the general consideration that additional security measures often will be appropriate when trial proceedings take place outside of the courtroom, the record makes clear that this case presented unusually serious security risks. Mr. Lopez stood accused of committing a brutal, cold-blooded murder. He also had been charged in a second "execution-style" murder; in that second case, participants allegedly had discussed "taking action against witnesses." *Lopez*, 2004 WL 1533992, at *3. The State also told the court prior to trial that Mr. Lopez was a member of a "heavily armed" drug organization, and, indeed, he also had been named as a co-conspirator in a federal drug prosecution. *Id.* In light of all of these considerations, the trial court found the risk of violence to be so serious that it ordered the jury list sealed and ordered the jury sequestered during the trial. Jury sequestration is rare in Wisconsin; it is reserved for cases involving "unusual circumstances trumping budgetary concerns." *Id.* at *2.

The Court of Appeals of Wisconsin did not act unreasonably in holding that the security measures in place

at the jury view were appropriate. Given the serious charges that Mr. Lopez faced in both state and federal court, the violent nature of the charged crimes, and his alleged membership in a violent, well-armed drug organization, there was ample reason to prepare for any number of violent eventualities. Mr. Lopez might have tried to escape, perhaps with the assistance of his drug associates. Mr. Lopez or a confederate might have attempted to harm the judge or the jurors. Or some interested party might have attempted to harm Mr. Lopez himself—a member of the victim's family, perhaps, or an alleged co-conspirator seeking to silence him. At least one of the jury view locations was outdoors and, therefore, particularly difficult to secure. In light of all this, it was reasonable to expect that violence at the jury view was a real possibility. Accordingly, it was reasonable to take precautions to protect against such risks. The precautions taken here were undoubtedly extreme, but so were the circumstances justifying them.

Not only was the danger posed to the court, the jurors and the general public significant, but the risk of prejudice to Mr. Lopez was not the same as it would have been in a courtroom setting. The purpose behind the presence of the SWAT officers at a jury view outside the courtroom was somewhat ambiguous. The officers' presence could have been for any of the purposes that we have enumerated or for all of them. Jurors well could appreciate this distinction and, consequently, be less likely to draw conclusions about the defendant's guilt upon seeing heightened security measures in effect at a venue outside the courtroom. Armed guards sur-

rounding a defendant in a courtroom might well send the message to the jurors that the defendant is "dangerous or untrustworthy." *Holbrook*, 475 U.S. at 579 (quoting *Kennedy v. Cardwell*, 487 F.2d 101, 108 (6th Cir. 1973)). On the other hand, armed guards around a defendant as part of a general show of police strength in the area may not be as susceptible to the same inference. Jurors who see a defendant guarded by police outside the courtroom are less likely to ascribe the use of such a measure to the defendant's dangerousness and more likely to view it as a routine precaution.

We also note that the trial court took steps to minimize any prejudicial effect on Mr. Lopez by twice instructing the jury not to make any inferences from the security measures that were in effect during the jury view. The court specifically told the jurors that the precautions they saw were routine for jury views, and that they should not infer anything about Mr. Lopez's guilt or innocence from the degree of security.[8]

---

[8] Mr. Lopez submits that these instructions were irrelevant because "[t]he security restraints used doing the jury view . . . were so inherently prejudicial that the jury could not possibly ignore what they implied." Appellant's Br. 28. Although the Supreme Court has acknowledged that some security practices undertaken inside the courtroom might be so pervasively prejudicial that no jury instruction could cure them, *see Holbrook*, 475 U.S. at 570, we can identify no clearly established principle holding that the precautions at issue in this case fall into that category. Thus, we must reject Mr. Lopez's argu-

(continued...)

In sum, we conclude that the circumstances that were present at the time of the jury view, combined with the curative jury instructions, are sufficient to support the Court of Appeals of Wisconsin's holding that the security measures during the jury view were reasonable.

## D.

Finally, even if the trial court erred by permitting the security measures at issue here, any error was harmless. The Court of Appeals of Wisconsin did not consider the issue of harmless error, because it concluded that there was no error on the part of the trial court. Thus, there is no state-court ruling on this issue to which we owe deference, and we are free to "dispose of the matter as law and justice require." *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008) (citing 28 U.S.C. § 2243). On habeas review, we must conclude that an error was harmless unless we determine that it "had substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

The record in this case does not support the conclusion that the security precautions taken during the jury view, even if they crossed the line into unreasonableness, had a substantial and injurious effect or

---

[8] (...continued)

ment that the precautions at issue here were inherently prejudicial.

influence on the jury's verdict. As we already have discussed, the unusual circumstances in this case justified a very high degree of security in order to secure Mr. Lopez and to protect the trial's participants during the jury view. Thus, even if the measures taken were excessive, they could have overshot the mark only by a small margin. Furthermore, the jury view took up only a small portion of the trial—just a few hours in a trial that lasted for several days. The rest of the trial took place in the courtroom, under standard security measures to which Mr. Lopez does not object. The court also instructed the jury that the measures in place during the jury view were routine and that they should draw no negative inference from them. As a general rule, "we assume that the jury obeys the judge's instructions." *Pomer v. Schoolman*, 875 F.2d 1262, 1265 (7th Cir. 1989).

Finally, a review of the evidence satisfies us that the jury returned a guilty verdict because the State proved its case, not because the jury view prejudiced the jurors against Mr. Lopez. The State produced a witness, Clinton Lampshire, who testified from personal knowledge that Mr. Lopez committed the murder. Two other witnesses—one of whom was Mr. Lopez's nephew—testified that Mr. Lopez told them that he had shot the victim. The State also introduced into evidence the murder weapon, which it was able to tie to Mr. Lopez through witness testimony.

Thus, we conclude that any error the trial court might have committed ultimately was harmless.

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the district court.

AFFIRMED