# RICHIE FONTAINE, Appellant/Defendant
## v.
# PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff

S. Ct. Criminal No. 2011-0071

Supreme Court of the Virgin Islands

September 13, 2013

CARL R. WILLIAMS, ESQ., Birch, deJongh & Hindels, PLLC, St. Thomas, USVI, *Attorney for Appellant.*

PAMELA R. TEPPER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(September 13, 2013)

CABRET, *Associate Justice.* Following a jury trial, Richie Fontaine and his co-defendant Cuthbertson Thomas were convicted of nine felony counts each, arising from a shooting outside of an elementary school on St. Thomas. Fontaine challenges his convictions on three grounds: (1) the trial court erred in denying his motion for acquittal because the prosecution did not present sufficient evidence to convict, (2) the trial court erred in denying Fontaine's motion to strike the testimony of Detective Jose Allen, and (3) the trial court erred by permitting the jury to see Fontaine in the presence of heavily armed marshals during an out-of-court viewing of the crime scene. For the reasons that follow, we affirm Fontaine's convictions, but remand for resentencing in conformity with 14 V.I.C. § 104.

## I. FACTUAL AND PROCEDURAL HISTORY

On May 6, 2009, shots were fired in the vicinity of the Emmanuel Benjamin Oliver Elementary School on St. Thomas. At the scene of the shooting, a purple Toyota Corolla was struck by multiple bullets.

Although the passengers were not injured, one bullet entered a school bus and injured M.H., a ten-year-old minor. On September 23, 2009, the People filed an Information, which was later amended, charging Fontaine and Thomas with nine crimes each arising from the shooting.[1]

On December 1 and 3, 2010, Fontaine and Thomas were jointly tried before a jury. The People first called Shunell Fregiste, the driver of the purple Corolla. Fregiste testified that on the day of the shooting he drove, unlicensed, to Emmanuel Benjamin Oliver Elementary School to pick up a friend's child. Larry Fontaine and two minors were passengers in the car with him.[2] While outside the school, Fregiste spotted three individuals walking down a nearby one-way street. He recognized two of the three individuals as Fontaine and Thomas, and testified that Fontaine had a "short" and "tough" build and was wearing a white shirt. (J.A. 62-63, 86.) Both men had masks or scarves obscuring parts of their faces. Despite the mask, however, Fregiste testified he was able to recognize Fontaine because they had grown up together in Dominica, where they lived on the same street. Moments after seeing both men, Fregiste saw them reach inside their clothing and draw out firearms. Fregiste sped up, but came across a green truck and a school bus in his path. Fregiste then heard gunshots from behind his car, turned back in his seat to look, and saw Fontaine, Thomas, and the third individual he did not know firing in the direction of his vehicle. Fregiste swerved around the school bus and escaped, although his car was struck by bullets before getting away.

After returning home, Fregiste asked a friend to tell the police that she had been driving the purple Corolla. Fregiste did not tell her, however, or the other passenger in the car, that he recognized two of the shooters. A few days after the shooting, on May 15, 2009, Fregiste spoke to the police for the first time, but denied driving the purple Corolla, seeing any weapons, or being able to identify anyone involved in the shooting. Two weeks after the shooting, on May 20, 2009, Fregiste spoke with the police

---

[1] The amended information charged both Fontaine and Thomas with one count of attempted murder pursuant to V.I. CODE ANN. tit. 14 §§ 11(a), 331, 921, 922(a); two counts of third-degree assault pursuant to 14 V.I.C. §§ 11(a), 297(2); three counts of unauthorized use of a firearm during the commission of a crime of violence pursuant to 14 V.I.C. §§ 11(a), 2253(a); one count of child abuse pursuant to 14 V.I.C. §§ 11(a), 505; one count of aggravated child abuse pursuant to 14 V.I.C. §§ 11(a), 505, 506; and one count of reckless endangerment pursuant to 14 V.I.C. §§ 11(a), 625(a).

[2] Larry Fontaine is unrelated to Appellant Richie Fontaine.

a second time and gave a written statement, admitting that he drove the car and identifying Thomas and Fontaine as the shooters. During his second meeting with the police, Fregiste said that he had not actually seen Thomas and Fontaine with the guns; instead, he said that he saw them immediately before the shooting with masks over their faces coming towards the vehicle. At that time, Fregiste also picked Thomas out of a photo array as one of the shooters. Defense counsel brought out each of these inconsistencies in Fregiste's statements to the police during cross-examination. Fregiste also admitted on cross-examination that he instructed his friend to lie to the police because he was driving without a license and was afraid that he would be prevented from getting a license in the future if his unlicensed driving was discovered.

Next, the People called Larry Fontaine, who was a passenger in the car with Fregiste on the day of the shooting. Larry Fontaine testified that he and Fregiste drove to the elementary school, that he saw three men wearing white shirts approach the car with "their hands sticking out," and then heard a lot of gunfire. (J.A.123-26, 137.) He described one of the men as tall and thin and the other as short and chubby. He also testified that he did not see scarves or anything covering the faces or heads of the three men he saw on the day of the shooting. Despite that fact, he was unable to identify any of the shooters because he only "[g]lanced them, like seconds" before reacting to the shooting by moving to cover the children in the back of the car. (J.A. 127, 130.)

A third eyewitness, Michelle Baron, told the jury that she was sitting in her car parked down the street from the school listening to gospel music on May 6, 2009, when the shooting occurred. Baron testified that she heard ten to fourteen gunshots and saw a purple car and a white car speed past her car. However, Baron did not see the shooters. After the shooting, she left her car and walked up to the scene where she found M.H. wounded in the school bus.

The People also called Detective Jose Allen who testified that he was personally familiar with both Fontaine and Thomas. Detective Allen told the jury that he had seen Thomas and Fontaine together and was aware that they knew each other. He also testified that he had seen Thomas wear a black New York Yankees baseball cap on prior occasions. Just before cross-examination, the People requested a sidebar conference to inform the court and the defendants' attorneys that Allen knew Thomas and Fontaine because of their involvement in prior criminal investigations.

The People alerted the defendants' attorneys to that information in the event that they chose to limit their cross-examination to avoid the jury hearing anything prejudicial concerning those investigations. In response, Fontaine and Thomas moved to strike Allen's testimony, claiming that their ability to cross-examine Allen was unduly hampered. Thomas also moved for a mistrial. The judge denied the motions to strike and Thomas's motion for a mistrial, finding that the jury had not heard any prejudicial testimony and that the attorneys still had the opportunity to cross-examine Allen.

The People also called M.H., who testified that following school on May 6, 2009, he was in the school bus waiting to be driven to an afterschool program when he heard "seven or so gunshots," felt something hit him, and then fell to the floor. M.H. did not testify to seeing the shooters. Through other witnesses, the People admitted into evidence M.H.'s shirt and jacket showing a bullet hole in them as well as his medical records and a picture of his wound. The emergency responders who transported M.H. to the Roy L. Schneider Hospital on St. Thomas, as well as the physician who treated him at the hospital, also testified about M.H.'s injuries. M.H.'s physician explained that M.H. had to be airlifted to Puerto Rico for further treatment because of the seriousness of his injuries. The People then rested and Fontaine did not call any witnesses.

The trial judge then permitted the jury to visit the scene at Emmanuel Benjamin Oliver Elementary School. Although the jury visit occurred after the final witnesses had testified for the People and the People had indicated that it was closing its case on the record, the jury visit had been requested and scheduled at the beginning of trial. At the school, the jurors were permitted to view the scene, but no witnesses testified and no other evidence was presented to the jury. The defense attorneys objected to the presence of Superior Court Marshals displaying firearms at the scene and requested that the court give the jurors a limiting instruction to avoid any prejudice. The trial court provided the requested instruction once the jurors and parties returned to court.

Following closing arguments and jury instructions, the jury began deliberations. The same day, December 3, 2010, the jury returned with a unanimous guilty verdict against both defendants on all counts. On June 15, 2011, Fontaine filed an Omnibus Motion for Judgment of Acquittal or for a New Trial. In a July 29, 2011 Memorandum Opinion and Order, the

Superior Court denied Fontaine's motion. On October 3, 2011, the Superior Court entered judgment, sentencing Fontaine to twenty years for attempted murder, fifteen years for unauthorized possession of a firearm during the commission of an attempted murder, five years for third-degree assault, fifteen years for unauthorized possession of a firearm during the commission of a third-degree assault, twenty years aggravated child abuse, and five years for reckless endangerment. The court ordered all of the sentences to run concurrently with the sentence for attempted murder except the sentence for aggravated child abuse which the court ordered to run consecutively. The court also deemed the second conviction for third-degree assault merged with the conviction for attempted murder, the third conviction for unauthorized possession of a firearm merged with the first conviction for that same offense, and the child abuse conviction merged with the aggravated child abuse conviction. Lastly, the court imposed two $25,000 fines pursuant to the firearm statute and $75 in court costs. On September 6, 2011, Fontaine filed a timely notice of appeal.[3]

## II. JURISDICTION

We have jurisdiction over this criminal appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which provides that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." A judgment in a criminal case is a final order from which an appeal may lie. *Brown v. People*, 49 V.I. 378, 380 (V.I. 2007).

## III. DISCUSSION

On appeal, Fontaine argues: (1) that the trial court erred in denying his motion for judgment of acquittal because the prosecution did not present sufficient evidence to convict; (2) that the People failed to prove that he had the requisite intent to commit unauthorized possession of a firearm, attempted murder, or attempted assault in the third degree; (3) the trial

---

[3] Supreme Court Rule 5(b)(1) provides that "[a] notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment." Therefore, even though Fontaine filed his notice of appeal before the Superior Court's Judgment and Commitment was entered into the docket, it is timely.

court erred in denying his motion to strike the testimony of Detective Jose Allen; and (4) that the trial court erred by permitting the jury to see Fontaine in the presence of heavily armed marshals during an out-of-court viewing of the crime scene. We consider each argument in turn.

## A. The People Presented Sufficient Evidence to Convict.

In his first argument, Fontaine claims that the Superior Court should have granted his motion for judgment of acquittal because Fregiste, the only witness who placed him at the scene of the crime, was unreliable. Fontaine raises a similar challenge in his second argument, claiming that the People failed to prove that he committed unauthorized possession of a firearm, or had the intent to commit attempted murder in the first degree, and attempted assault in the third degree. Because Fontaine's first and second arguments challenge the sufficiency of the evidence by questioning whether the jury could rationally accept Fregiste's version of the events, we consider both arguments together.

"[I]n reviewing the Superior Court's denial of [Fontaine's] motion for judgment of acquittal based on the sufficiency of the evidence, we exercise plenary review and apply the same standard as the trial court." *Francis v. People*, 56 V.I. 370, 379 (V.I. 2012) (citing *Stevens v. People*, 52 V.I. 294, 304 (V.I. 2009)). In assessing whether the People presented sufficient evidence to convict, "this Court is required to view the evidence in the light most favorable to the People and apply a highly deferential standard of review to the jury's verdict." *Augustine v. People*, 55 V.I. 678, 684 (V.I. 2011) (citing *Stevens*, 52 V.I. at 304). We are typically "prohibited from weighing the evidence or determining the credibility of witnesses." *Williams v. People* (*Williams I*), 56 V.I. 821, 835 (V.I. 2012) (citing *Smith v. People*, 51 V.I. 396, 401 (V.I. 2009)).

██ Fontaine concedes that our typical standard of review for sufficiency challenges is to defer all credibility determinations to the jury. He argues, however, that "this Court is not obligated to accept a jury's credibility determination where a witness'[s] testimony is so unbelievable, incredulous, or unsubstantiated as to be incredible as a matter of law." (Appellant's Br. 11 (citing *United States v. Stanback*, 454 Fed. Appx. 741 (11th Cir. 2011)).) Fontaine is correct that some courts have recognized an appellate court's responsibility to review credibility determinations in sufficiency challenges where the witness's testimony was "incredible as a matter of law." *See, e.g., United States v. Flores,*

572 F.3d 1254, 1263 (11th Cir. 2009) ("Credibility determinations are left to the jury and the jury's verdict will not be disturbed on appeal unless the testimony is incredible as a matter of law." (internal quotation marks and citation omitted)). Nevertheless, appellate review of credibility determinations is "ultra-narrow," *United States v. Kizeart*, 505 F.3d 672, 675 (7th Cir. 2007), and before an appellate court can overturn a jury's credibility determination, the appellant must satisfy

> an exacting standard[] [which] can be met, for instance, by showing that it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all. In contrast, witnesses' disagreements about such facts as the color or direction of the car are routine conflicts in testimony, inconsistencies well within the province of the jury to sort out.

*United States v. Hayes*, 236 F.3d 891, 896 (7th Cir. 2001) (internal quotation marks and citations omitted); *see also United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir. 1991) ("[T]he jury is the ultimate arbiter of the credibility of a witness; testimony generally should not be declared incredible as a matter of law unless it asserts facts that the witness physically could not have observed or events that could not have occurred under the laws of nature."); *Phillip v. People*, 58 V.I. 569, 584 (V.I. 2013) ("[A]n appellate court may disregard the jury's reliance on a witness's testimony when that testimony is 'inherently incredible or improbable.' " (quoting *Williams v. Gov't of the V.I.*, 51 V.I. 1053, 1086 (D.V.I. App. Div. 2009), *rev'd on other grounds*, 410 Fed. Appx. 448 (3d Cir. 2011)).

Here, the evidence presented was the kind "well within the province of the jury to sort out." *Hayes*, 236 F.3d at 896. At trial, Fregiste admitted that he lied or omitted details in each of his pretrial encounters with police and also admitted that he asked his friend to falsify a police report to say she was driving the purple Corolla at the time of the shooting. Detective Sofia Rachid, the lead investigator, corroborated Fregiste's testimony that he initially lied to the police about who drove the car. While Fregiste's testimony conflicted somewhat with the testimony of another eyewitness, Larry Fontaine — specifically that the shooters, including Fontaine were wearing masks — despite the inconsistencies, Fregiste's testimony largely corroborated Larry Fontaine's testimony. Larry Fontaine testified that he was with Fregiste on

649

May 6, 2009, and saw the same number of men (three), coming from the same street, wearing the same color shirts (white), with the same builds (one tall and skinny, one short and chubby), and that shots were fired at the car. Baron, another witness, also testified that on May 6, 2009, she saw a purple car matching the one Fregiste was driving speed away from the area. Finally, and most critically, there is no evidence in the record indicating that Fregiste would not have been able to see the three assailants from where he was in the car or that his version of the shooting was impossible under the laws of nature. Accordingly, we hold that Fregiste's testimony was not incredible as a matter of law and therefore we are bound to accept the jury's determination that his testimony was credible.

■ Fontaine's second argument similarly claims that the People failed to present sufficient evidence that he possessed the intent to commit the crimes of attempted murder, assault in the third degree, and unauthorized use of a firearm. Fontaine's claim, however, is not supported by the evidence presented at trial. Fregiste testified that he saw three males, two of whom he recognized as Fontaine and Thomas, withdraw firearms from underneath their shirts and begin firing at the car he was driving. Fregiste's testimony was corroborated by the other two eyewitnesses, Larry Fontaine, who described the build of the two men he saw shooting at the purple Corolla, and Michelle Baron, who testified that she heard multiple gunshots, saw a purple car speed off, and then walked up to the scene where she found M.H. injured. Forensic evidence also showed that bullets struck the purple Corolla and the school bus. Firearms records for the St. Thomas/St. John/Water Island District and the St. Croix District both showed that Fontaine was not licensed to possess a firearm on May 6, 2009. A reasonable jury could infer, based on this evidence, that Fontaine intended to assault and to murder Fregiste and that he did so while lacking authorization to possess a firearm. Because Fontaine's sufficiency argument rests solely on challenging Fregiste's credibility, we reject Fontaine's challenge and hold that there was sufficient evidence to convict.

## B. The Superior Court Did Not Commit Reversible Error in Denying Fontaine's Motion to Strike the Testimony of Detective Jose Allen.

Fontaine next argues that the Superior Court committed reversible error by denying his motion to strike Detective Allen's testimony,

claiming he "was effectively cut-off from cross examining Detective Allen on his testimony because to do so would have elicited or opened the door to elicit testimony regarding [Fontaine]'s prior criminal acts." (Appellant's Br. 13.) The People counter that the court did not abuse its discretion in denying Fontaine's motion to strike Detective Allen's testimony because his testimony "was not prejudicial and [Fontaine] had an opportunity for cross examination." (Appellee's Br. 10.) The Superior Court held that the admission of Allen's testimony did not violate the Confrontation Clause because (1) the court "was careful to limit Allen's testimony to avoid the introduction of prejudicial information regarding Fontaine's prior crime," (2) Fontaine was not prevented from investigating the witness's background and character, and (3) the "jury was charged with weighing the credibility of witness Allen[; therefore,] any error in admitting Allen's testimony [wa]s harmless in light of other evidence presented at trial." (J.A. 651-52.) "The standard of review for challenges under the Sixth Amendment's Confrontation Clause is plenary." *Latalladi v. People*, 51 V.I. 137, 141 (V.I. 2009) (citing *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir. 1998)).

■ The Sixth Amendment's Confrontation Clause provides in pertinent part that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 50, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Supreme Court explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." This Court has found that "the Confrontation Clause is implicated [if] a declarant's statement is introduced against the defendant at trial and the declarant does not appear at trial." *Rivera v. People*, 53 V.I. 589, 593 (V.I. 2010) (citing *Crawford*, 541 U.S. at 59). The facts of this case are unlike the circumstances in *Crawford* or *Rivera* where a witness's statements against the defendant were introduced, but the witness did not appear at trial. Here, Detective Allen appeared at trial and the contentious statements were those Allen made at trial. Therefore, no Sixth Amendment Confrontation Clause deprivation of the types considered in *Crawford* and *Rivera* occurred here.

■ ■ Nevertheless, Fontaine contends that because of the *risk* that highly incriminating evidence might have been elicited if he had cross-examined Allen, his Sixth Amendment right to confrontation was

651

unconstitutionally impaired. Although this Court is disturbed by the People's actions — in this case putting on testimony that it knew could only be impeached by opening the door to inadmissible testimony and doing so without first apprising the Superior Court or the defendant — we nevertheless do not reach the issue of whether the People violated Fontaine's Sixth Amendment right because we find beyond a reasonable doubt that any such violation would have been harmless. *See Browne v. People*, 56 V.I. 207, 229 (V.I. 2012) (requiring that a violation of the Confrontation Clause must be harmless beyond a reasonable doubt to avoid reversal). Here, the People offered Allen's testimony to establish that Fontaine and Thomas knew each other, that Allen had seen them together in the past, and that Allen had seen Thomas wear a New York Yankees baseball cap in the past. First, we note that none of this testimony implicated the main issue — whether Fregiste correctly identified the shooters as Fontaine and Thomas. Additionally, Fregiste testified at much greater length about the basis of his identification of Thomas and Fontaine, namely that he had grown up with both men, had known them for decades, and knew them to be close friends both in Dominica and in the Virgin Islands. Fregiste also testified that Thomas had a habit of wearing a New York Yankees baseball cap. Accordingly, Detective Allen's testimony was merely cumulative. *See id.* at 237 (noting that in conducting harmless error review, the Court may consider whether the improperly admitted evidence was cumulative). Consequently, even if the Superior Court erred by not striking Detective Allen's testimony, we are confident beyond a reasonable doubt that any error did not have an effect on the jury's verdict.

Lastly, Fontaine argues that, in permitting the jury to consider Detective Allen's testimony, the trial court abused its discretion under Rule 403 of the Federal Rules of Evidence. Fontaine asserts that Detective Allen's "testimony was inflammatory to Fontaine and had no probative value." (Appellant's Br. 16.) At trial, Fontaine only objected to Detective Allen's testimony based on the Confrontation Clause, not the rules of evidence. Therefore, we review this portion of his argument only for plain error. *See Fontaine v. People*, 56 V.I. 571, 580 n.5 (V.I. 2012) ("For this Court to reverse the judgment of the Superior Court under the plain error standard of review, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. . . . However, even if all three conditions are met, this Court would reverse the Superior Court only if (4) the error

seriously affects the fairness, integrity, or public reputation of judicial proceedings." (internal quotation marks, citations, and alterations omitted)).

 Federal Rule of Evidence 403 states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.[4]

Fontaine argues that the Superior Court should have stricken Detective Allen's testimony because it lacked probative value. However, as Fontaine himself acknowledges, the People's inquiry of Detective Allen was confined to questions regarding (1) whether he knew Fontaine, (2) whether he saw Fontaine in the courtroom, and (3) whether Fontaine knew his co-defendant Cuthbertson Thomas. Thus, the People offered Detective Allen's testimony to corroborate Fregiste's testimony that Fontaine and Thomas knew each other. As noted above, Fontaine did not object based on relevancy and he fails to show on appeal why Detective Allen's testimony was not relevant or how denying his motion to strike prejudiced him.[5] As the Superior Court observed, nothing the jury heard from Detective Allen was prejudicial. Rather, the potential for prejudice concerned what Detective Allen might have testified to on cross-examination. Fontaine asks us to presume prejudice, however, arguing that "it is not an unreasonable leap [of logic] to argue that the People wanted to impermissibly draw the jury's attention or focus the jury's memory on the then recent trial and conviction of [Fontaine] in the 'Club Lexus' murder case, a murder case investigated by Detective Allen." (Appellant's Br. 17.) Fontaine did not direct the trial court to anything that might indicate that the jurors knew of Fontaine's involvement in another criminal matter or that Detective Allen investigated that

---

[4] The wording of Rule 403 was substantively identical at the time of Fontaine's trial in 2010, and the current version is thus set forth here. See Advisory Committee Note on 2011 Amendments (Rule 403 wording "changes are . . . stylistic only").

[5] Fontaine claims on appeal that the Superior Court also erred by denying his motion for a mistrial. It was Thomas's counsel, however, not Fontaine's counsel, who moved for a mistrial based on Detective Allen's testimony. And Fontaine's counsel never joined that motion. Since Fontaine never raised this issue before the Superior Court and only addresses it in a perfunctory manner without argument or citation to legal authority, we deem it waived pursuant to Virgin Islands Supreme Court Rule 22(m) and decline to address it.

matter. In plain error review, the burden is on the appellant to show an error that is plain that affects substantial rights. Fontaine has not carried that burden here. Accordingly, Fontaine has failed to show that the Superior Court erred by denying his motion to strike Detective Allen's testimony. Therefore, we reject Fontaine's contention that we must set aside his convictions and grant him a new trial based on the admission of Allen's testimony.

## C. The Presence of Armed Marshals at the Site View.

Fontaine next argues that the presence of heavily-armed Superior Court Marshals during the jury's visit to the crime scene was an error that requires a new trial. However, at the site visit, the only thing that Fontaine's attorney requested of the Superior Court was a limiting instruction explaining the purpose of the marshals and their weapons. The jury received that instruction.[6] On appeal, Fontaine does not challenge the court's instruction, instead he argues that the court should have, apparently *sua sponte*, declared a mistrial based on the presence of the marshals on the grounds that Fontaine's due process rights were denied. Fontaine never moved the Superior Court for a new trial based on the marshal's presence, either in his motion for a new trial or at the site visit itself, and accordingly we review only for plain error. *See Nanton v. People*, 52 V.I. 466, 475 (V.I. 2009).

■■ Although many courts have discussed the impact of security procedures inside a courtroom, only a few have discussed at length the latitude provided to trial courts in securing an out-of-court site view. *See, e.g., Lopez v. Thurmer*, 573 F.3d 484, 490-95 (7th Cir. 2009); *State v. Lopez*, 275 Wis. 2d 878 (2004) (unpublished). In *Thurmer*, the United States Court of Appeals for the Seventh Circuit found that a trial court has a constitutional obligation under the Due Process Clause to weigh the

---

[6] When the jury returned from the jury view, the court gave the following instruction to the jury:

> Ladies and gentlemen, some of you may have noticed that there were weapons on the scene. Those weapons were there for your protection. And you should not draw any inferences whatsoever with regard to the fact that weapons were displayed or were present during that view of the scene. That is standard procedure to make sure that you are safe, that I'm safe, that everybody involved is safe. And it should have no influence whatsoever on your verdict in this case.

(J.A. 438.) Fontaine never objected to this instruction or moved for a mistrial on the grounds that the instruction was somehow insufficient.

security precautions taken to prevent potential security risks against the potential prejudice to the defendant. 573 F.3d at 491-92. The court explicitly extended this requirement to site views outside of the courtroom. *See id.* at 492. The court recognized that

> [t]rial courts should have, in any event, significantly more latitude in gauging the appropriate security measures for a jury view outside the courtroom. Although there is a significant amount of case law and professional material on the proper maintenance of security in the courtroom environment, jury views outside the courtroom necessarily require a significant recalibration of the security/prejudice balance. The trial judge is faced with an unfamiliar locale and with a multifaceted security problem that bears little resemblance to the more contained situation presented by the conventional courtroom. Jurors generally will understand and appreciate this distinction, and, therefore, will be less likely to draw conclusions about the defendant's guilt upon seeing heightened security measures in effect. Thus, the decision to impose this kind of extra security might well be constitutionally reasonable for a proceeding outside the courtroom, even though the principles enunciated in [Supreme Court precedents] rarely would permit such restraints in the courtroom.

*Id.* at 494 (footnote omitted). In *Thurmer*, the jury spent several hours on a site view to the scene of a murder. *Id.* at 496. The defendant, surrounded by SWAT team members, accompanied the jury. *Id.* at 487. The court found that

> Mr. Lopez might have tried to escape, perhaps with the assistance of his drug associates. Mr. Lopez or a confederate might have attempted to harm the judge or the jurors. Or some interested party might have attempted to harm Mr. Lopez himself — a member of the victim's family, perhaps, or an alleged co-conspirator seeking to silence him. At least one of the jury view locations was outdoors and, therefore, particularly difficult to secure. In light of all this, it was reasonable to expect that violence at the jury view was a real possibility. Accordingly, it was reasonable to take precautions to protect against such risks. The precautions taken here were undoubtedly extreme, but so were the circumstances justifying them.
>
> Not only was the danger posed to the court, the jurors and the general public significant, but the risk of prejudice to Mr. Lopez was not the

same as it would have been in a courtroom setting. The purpose behind the presence of the SWAT officers at a jury view outside the courtroom was somewhat ambiguous. The officers' presence could have been for any of the purposes that we have enumerated or for all of them. Jurors well could appreciate this distinction and, consequently, be less likely to draw conclusions about the defendant's guilt upon seeing heightened security measures in effect at a venue outside the courtroom. Armed guards surrounding a defendant in a courtroom might well send the message to the jurors that the defendant is dangerous or untrustworthy. On the other hand, armed guards around a defendant as part of a general show of police strength in the area may not be as susceptible to the same inference. Jurors who see a defendant guarded by police outside the courtroom are less likely to ascribe the use of such a measure to the defendant's dangerousness and more likely to view it as a routine precaution.

*Id.* at 495 (internal quotation marks and citation omitted). After weighing the security risks against any potential prejudice, the court found no error and affirmed the denial of habeas corpus relief relating to these events. *Id.* at 496.

 In this case, the security measures were not nearly so extreme — Fontaine and Thomas were approximately five to ten feet away from a single marshal who carried either a shotgun or a rifle. The judge and attorneys were approximately fifteen feet away from other marshals holding automatic weapons. The People noted on the record that the marshals were all along the perimeter of where the scene was blocked off from the public. Indeed, on the record, the judge noted that "the weapons are displayed only at the periphery of the view of the scene." (J.A. 433.) The judge also noted that a local newspaper had run a story publishing the fact that the court would be conducting a site view that morning, so the need to control the scene was even higher than in other non-publicized outdoor site views. Finally, we also note, as the court did in *Thurmer*, that the trial court took steps to minimize any prejudice to Fontaine by instructing the jury, as soon as they returned to the courtroom, that the marshals were at the site view for the protection of the jury and the court and that they were not permitted to draw any negative inferences against the defendants based on the presence of the marshals or their weapons. Accordingly, because of the wide latitude provided to the Superior Court

in determining security measures for out-of-court trial proceedings, the relative reasonableness of the security measures in this case, and the jury instruction reducing any potential prejudice to the defendant, we hold that the Superior Court committed no error, much less a plain one.

## D. Fontaine's Sentences Require Remand.

Although Fontaine does not raise the legality of his sentence on appeal, in light of this Court's recent decisions, we address *sua sponte* whether his sentences violate 14 V.I.C. § 104. *See Williams I*, 56 V.I. at 830-31; *Brown v. People*, 55 V.I. 496, 506-07 (V.I. 2011) (raising and addressing an illegal sentence *sua sponte*). Because Fontaine failed to raise the issue of multiplicity of convictions and sentences before the Superior Court, we review for plain error. *Williams I*, 56 V.I. at 830 (quoting *United States v. Zalapa*, 509 F.3d 1060, 1064 (9th Cir. 2007)).

 Section 104 of title 14 of the Virgin Islands Code states:

An act or omission which is made punishable in different ways by different provisions of this Code may be punished under any of such provisions, but in no case may it be punished under more than one.

As we explained in *Williams I*, title 14, section 104 of the Virgin Islands Code provides that notwithstanding the fact that an individual can be charged and convicted of violating multiple provisions of the Virgin Islands Code, that individual may only be *punished* for one of the offenses arising out of a single act. 56 V.I. at 833-34. We recently clarified this holding in *Phillip*, acknowledging that a " 'defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person,' " and therefore under the "multiple victim" exception to section 104's prohibition against multiple punishments for the same act or omission, a defendant may nonetheless receive multiple punishments when a single act of violence harms or risks harming more than one person. *Phillip*, 58 V.I. at 593 (quoting *Neal v. State*, 55 Cal. 2d 11, 9 Cal. Rptr. 607, 357 P.2d 839, 844 (1960)). The multiple-victim exception applies here because Fontaine's act of violence — opening fire on a vehicle in the vicinity of an elementary school — was a singular course of conduct that resulted in harm to Fregiste, to M.H., and also risked harming the public in general. *See id.* at 593 ("For the multiple-victim exception to apply, there must be an act of

violence that harms or risks harming more than one person." (citing *Neal*, 357 P.2d at 844)).

Here, Fontaine was charged with and convicted of the following offenses: three counts of using an unlicensed firearm during the commission of a crime of violence; two counts of assault in the third degree; and one count each of attempted murder in the first degree, child abuse, aggravated child abuse, and reckless endangerment in the first degree. On the facts of this case, the Superior Court correctly determined that Fontaine's conviction for attempted murder and one of his convictions for third-degree assault arose out of the same conduct, namely unlawfully firing a gun at Fregiste, and thus because both offenses involved the same victim and arose out the same course of conduct, Fontaine could only be punished for one offense. In addition to placing Fregiste in fear of death, however, Fontaine also risked injuring members of the public by opening fire outside a crowded elementary school. Thus, the Superior Court correctly determined that reckless endangerment was a separate offense for which Fontaine may also be punished. *See Phillip*, 58 V.I. at 594 ("the multiple-victim exception permits us to affirm Phillip's sentences for first-degree murder and first-degree reckless endangerment" because "he committed a single act of violence that harmed or risked harming more than one person"). The Superior Court also correctly applied section 104's multiple-victim exception to Fontaine's firearms convictions by imposing punishment on two of those counts — each count relating to a separate victim — and staying imposition on the third count.

■■ ■ But section 104 nonetheless precludes imposing multiple punishments for multiple offenses that arise out of the same conduct and harm the same victim. Here, Fontaine was convicted of assault in the third degree on M.H. as well as child abuse and aggravated child abuse in relation to M.H. Those offenses — while separate from the offenses involving Fregiste or the public in general — nonetheless arise out of the same course of conduct harming the same victim, namely a stray bullet that inflicted serious injury on M.H. As all three offenses arose from the same conduct towards the same victim, the Superior Court correctly followed section 104 when it concluded that Fontaine could not be punished for both child abuse and aggravated child abuse. However, the court failed to follow section 104 because it did not stay punishment for

the third-degree assault perpetrated against M.H. in addition to aggravated child abuse.

■■■■■■ As we found in *Williams I*, the Superior Court's failure to heed section 104, even where the court provided for the sentences to run concurrently, is a plain error that requires reversal. 56 V.I. at 832-33. Accordingly, we remand for the Superior Court to enter conviction and announce a sentence for each offense Fontaine was convicted of, but then stay imposition of punishment where section 104 is implicated. *See Williams v. People (Williams II)*, 58 V.I. 341, 354 n.10 (V.I. 2013) (clarifying our holding in Williams' second appeal to this Court and explaining that "notwithstanding our imprecise language" section 104 requires that the Superior Court "announce a sentence for [each] offense[] and to subsequently stay execution of the sentences in which section 104 is implicated").

## IV. CONCLUSION

Fontaine's attack on Fregiste's credibility on appeal cannot form the basis for a successful sufficiency challenge. Likewise, any error in the admission of Detective Allen's testimony was harmless beyond a reasonable doubt. The Superior Court also did not err by allowing the presence of armed marshals during the site visit. Finally, we find that the Superior Court committed plain error by failing to sentence Fontaine in conformity with 14 V.I.C. § 104. Accordingly, we affirm Fontaine's convictions, but remand for resentencing.